BASIC CAPITAL MANAGEMENT, American Realty Trust, Inc., Transcontinental Realty Investors, Inc., Continental Poydras Corp., Continental Common, Inc., and Continental Baronne, Inc., Appellants,

v.

DYNEX COMMERCIAL, INC. and Dynex Capital, Inc., Appellees.

No. 05–04–01358–CV.

Court of Appeals of Texas, Dallas.

Feb. 22, 2008.

Michael L. Gaubert, Friedman & Feiger, L.L.P., William V. Dorsaneo, III, S. Wallace Dunwoody IV, Dallas, TX, for Appellants.

Charles L. Perry, Andrews Kurth LLP, Deborah G. Hankinson, Elana S. Einhorn, Rick Thompson, Law Offices of Deborah Hankinson, PC, Dallas, TX, for Appellees.

Before Justices WRIGHT, MOSELEY, and LANG.

## OPINION

Opinion by Justice MOSELEY.

Basic Capital Management, Inc. (BCM), American Realty Trust, Inc. (ART), Transcontinental Realty Investors, Inc. (TC1/CMET),[1] Continental Poydras Corp.

---

1. TCI merged with Continental Mortgage & Equity Trust (CMET) in November 1999, after this suit was filed. TCI was the surviving entity. The parties refer to this entity at trial and on appeal as "TCI/CMET," as do we.

(Poydras), Continental Common, Inc. (Common), and Continental Baronne, Inc. (Baronne), among others, sued Dynex Commercial, Inc., Dynex Capital, Inc., and others alleging breach of a $160 million loan commitment (the $160 Million Commitment) and breach of three promissory notes secured by commercial buildings in New Orleans (the New Orleans Loans).[2] A jury awarded appellants damages on these breach of contract claims. However, the trial court granted the Dynex entities' post-verdict motions and entered a take-nothing judgment on all of appellants' claims. Appellants assert the trial court erred in entering the take-nothing judgment, and in not entering judgment on the verdict. Alternatively, they argue they are entitled to a new trial on their claims. For the reasons that follow, we affirm.

## I. BACKGROUND

BCM is a private company that manages publicly traded real estate investment trusts, including ART and TCI/CMET. (Appellants refer to these companies as "BCM affiliates.") The other appellants, Poydras, Common, and Baronne, are wholly-owned subsidiaries of TCI/CMET. Dynex Commercial and Dynex Capital are part of a Virginia-based group of real estate lending companies. Dynex Commercial underwrote, closed, and serviced loans, while Dynex Capital provided funding.

In 1997, representatives of BCM, Dynex Commercial, and Dynex Capital discussed a business relationship, which resulted in several loan transactions involving the Dynex entities and ART and subsidiaries of ART. BCM and Dynex Commercial also entered into another transaction, which involved two "intertwined" deals—the New Orleans Loans and the $160 Million Commitment. Specifically, Dynex Commercial agreed to fund the New Orleans Loans if BCM agreed to propose to Dynex $160 million of additional "acceptable loans."

The $160 Million Commitment was negotiated through correspondence between Dynex Commercial's president, William J. Moore, and BCM's managing director of capital markets, Cal Rossi. In his January 30, 1998 letter, Rossi listed ten "multi-family loan proposals" for apartments that "need[ed] to close by March, 1998 or early April." Both Moore and Rossi signed the fourth and final letter, dated February 16, 1998, which concerned "permanent financing" by Dynex Commercial of "various multifamily and commercial properties." The letters between Moore and Rossi stated the terms of the $160 Million Commitment, including the requirement that the borrower for each loan under the commitment would be a "Single Asset, Bankruptcy Remote Borrowing Entity [SABRE] acceptable to Lender ..."[3] As additional consideration for the $160 Million Commitment, BCM agreed to the recording of a $2 million second mortgage against the three properties that were to be the subject of

---

2. The parties asserted other claims and counterclaims, but there is no issue on appeal as to those claims and counterclaims.

3. At least two-thirds of these additional loan proposals would be for the purchase of multifamily residential properties (which made up Dynex's core business), with the balance being for the purchase of "seasoned Commercial property acceptable to Dynex." The loans "must be closed within 24 months." The loan amounts would be $2 to $15 million

each. For multifamily properties, the interest rate was 150 basis points above the ten-year treasury rate; for commercial properties, the interest rate was "[d]etermined on property specific basis." For multifamily property loans, the loan amortization would be a maximum of twenty-five years, with a mandatory nine and one-half year lockout; for commercial properties, the loan amortization period would be "[d]etermined on property specific basis."

the New Orleans Loans. BCM's affiliate, TCI/CMET, executed the $2 million second mortgage on the New Orleans properties.

The New Orleans Loans were memorialized by three promissory notes executed by Dynex Commercial as lender and Poydras, Common, and Baronne (respectively) as the borrowers. Under the notes, Dynex Commercial agreed to provide the borrowers a total of $37,000,000, including initial advances of $30,600,000 and future advances of $6,400,000 for tenant improvements. After the New Orleans Loans closed, Dynex Commercial transferred them to Dynex Capital.

In April 1998, Dynex Commercial lent $6 million to a TCI/CMET subsidiary (Transcontinental 4400, Inc.) pursuant to the $160 Million Commitment. However, Dynex Commercial never received any proposals on the multi-family loan transactions identified in Rossi's January 30 letter. Thereafter, market interest rates increased, making the interest rates agreed upon in the $160 Million Commitment unfavorable to lenders and favorable to borrowers. BCM then proposed other loans under the $160 Million Commitment, which Dynex Commercial refused to make; Dynex Commercial also refused February 1999 requests by a BCM asset manager for tenant improvement funds pursuant to the New Orleans Loans.

## II. PROCEDURAL HISTORY

Appellants filed suit, alleging that Dynex Commercial breached the $160 Million Commitment. In addition, BCM, TCI/CMET, Common, Poydras, and Baronne alleged that Dynex Commercial and Dynex Capital breached the New Orleans Loans by refusing to fund the tenant improvements. The Dynex entities filed a general denial, raised affirmative defenses, and asserted counterclaims and offsets.

As discussed in more detail herein, the trial court submitted a number of questions to the jury over the objections of Dynex Commercial and Dynex Capital. The jury generally found in favor of appellants. However, Dynex Commercial filed a motion to enter take-nothing judgment, and Dynex Capital filed a motion to disregard certain jury findings. The trial court granted these post-verdict motions and entered judgment that appellants take nothing by way of their claims. The trial court denied appellants' motion for new trial, and appellants timely filed their notice of appeal. Appellants' brief asserts eight issues; appellees filed a brief in response and assert five cross-points.

## III. JUDGMENT NOTWITHSTANDING VERDICT

In their first five issues, appellants argue the trial court erred by failing to enter judgment on the jury's findings that Dynex Commercial breached the $160 Million Commitment and that Dynex Commercial and Dynex Capital breached the New Orleans Loans. Thus, they challenge the trial court's grant of the Dynex entities' post-verdict motions, and its entry of a judgment notwithstanding the verdict.

### A. Applicable Law

"The judgment of the court shall conform to the pleadings, the nature of the case proved and the verdict...." Tex.R. Civ. P. 301. The trial court may enter a judgment notwithstanding the verdict if a directed verdict would have been proper; further, the court may, upon motion and notice, disregard any jury finding on a question that has no support in the evidence. *Id.* The test for legal sufficiency "must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *See City of Keller v. Wilson,* 168

S.W.3d 802, 827 (Tex.2005). Thus we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 807.

■■■ A trial court may also disregard a jury finding if it is immaterial, i.e., if the question should not have been submitted to the jury or if the question, although properly submitted, was rendered immaterial by other findings. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex.1994). As no recovery is allowed unless liability has been established, *Turner v. Lone Star Indus., Inc.*, 733 S.W.2d 242, 246 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.), "[w]ithout a liability finding, the question of damages becomes immaterial." *Ramirez v. Otis Elevator Co.*, 837 S.W.2d 405, 413 (Tex.App.Dallas 1992, writ denied).

## B. The $160 Million Commitment

Jury Questions 1 through 6 concerned the $160 Million Commitment. In its answers to Questions 1 through 4, the jury found that Dynex Commercial and BCM had entered into an agreement regarding the $160 Million Commitment; Dynex Commercial failed to comply with the terms of the $160 Million Commitment agreement; Dynex Commercial's failure to comply was not excused; and a January 7, 1999 letter from Dynex Commercial's president Moore to BCM's director Rossi was not an agreement to release the commitment.[4] None of these questions mentioned ART or TCI/CMET.

Question 6 (properly conditioned) asked: "What sum of money, if any, if paid now in cash would fairly and reasonably compensate [BCM], ART, and TCI/CMET for the damages caused by such failure to comply?" The Dynex entities timely objected to including ART and TCI/CMET in Question 6 because there were no "predicate contract and breach issues" as to those entities. In response, appellants argued that the Dynex entities failed to file a verified pleading as to lack of capacity on either plaintiffs' or defendants' part and had thereby waived that issue. The Dynex entities also objected to Question 6 because consequential damages were not a proper measure of damages under the evidence, there was no evidence that consequential damages were foreseeable, there was no predicate question inquiring as to the foreseeability of such damages, and there was no evidence of any consequential damages. The trial court overruled the objections, and Question 6 was included in the charge.

In calculating damages under Question 6, the jury was instructed to consider "Increased Costs" and "Lost Opportunity" damages, both of which phrases were defined in the instruction. The jury answered Question 6 as follows[5]:

| | | Increased Costs | Lost Opportunity |
|---|---|---|---|
| (A) [BCM]: | | $ 0 | $ 256,233 |
| (B) ART: | | $1,222,641 | $14,205,570 |
| (C) TCI/CMET: | | $ 960,646 | $11,161,520 |

In its post-verdict motion Dynex Commercial asked the trial court to disregard the jury's answers to Question 6. It argued the damage findings in favor of ART and TCI/CMET (Question 6(B) and (C)) were immaterial because there was no finding of

4. The jury did not answer Question 5, which asked, "Did [BCM] fail to comply with the January 7, 1999 Letter?"

5. Numbers are rounded to the nearest whole-dollar amount.

privity between it and those entities with respect to the $160 Million Commitment. Indeed, Dynex Commercial argued it was undisputed ART and TCI/CMET were not parties to that contract.[6] Dynex Commercial also argued the jury's "lost opportunity" damage finding in favor of BCM (Question 6(A)) was not supported by any evidence, that there was no evidence that such damages were foreseeable, and no evidence that BCM suffered any such damages.

As noted previously, the trial court granted this motion and entered a take-nothing judgment on appellants' claims based on the $160 Million Commitment. In their first, third, and fifth issues, appellants argue the trial court erred by failing to enter judgment on these claims in favor of ART, TCI/CMET, and BCM. We consider appellants' arguments under these issues first with respect to ART and TCI/CMET, and then with respect to BCM.

### 1. ART and TCI/CMET

Appellants make four arguments in support of their contention that the trial court erred by granting the post-verdict motion and entering a take-nothing judgment against ART and TCI/CMET on their claims based on the $160 Million Commitment.

*a. Standing, Capacity, and Applicability of Rule 93*

■ First, appellants argue that Dynex Commercial failed to raise an issue as to the standing or capacity of ART or TCI/CMET to assert claims for breach of the $160 Million Commitment because it did not file a sworn pleading raising those issues, as required by Rule 93. Dynex Commercial admits it filed no such verified pleading, but asserts that its post-verdict

motion did not attack ART's and TCI/CMET's standing or capacity to sue. We agree with Dynex Commercial.

■ A party who asserts an affirmative claim for relief has the burden of persuading the factfinder as to each element of his cause of action. *See Vance v. My Apartment Steak House of San Antonio, Inc.,* 677 S.W.2d 480, 482 (Tex.1984). That includes, for a breach of contract claim, the element of a valid contract between the plaintiff and the defendant. *See Barnett v. Coppell N. Tex. Court, Ltd.,* 123 S.W.3d 804, 815 (Tex.App.Dallas 2003, pet. denied).

■ "In a breach of contract action, the plaintiff has the burden to prove that the defendant has obligated himself under the contract; the defendant's denial of this element does not constitute an affirmative defense under Rule 93." *Miles v. Plumbing Servs. of Houston, Inc.,* 668 S.W.2d 509, 512 (Tex.App.Houston [14th Dist.] 1984, writ ref'd n.r.e.). Absent a purported execution of the contract by both the plaintiff and the defendant, "a defendant sued for breach of contract does not have to allege in a verified pleading that he is not a party to the contract." *C & C Partners v. Sun Exploration & Prod. Co.,* 783 S.W.2d 707, 722 (Tex.App.Dallas 1989, writ denied), *disapproved of on other grounds by Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998). *See also Cannon v. ICO Tubular Servs., Inc.,* 905 S.W.2d 380, 392 (Tex.App.-Houston [1st Dist.] 1995, no writ) (lack of privity "is neither an affirmative defense nor a matter that must be verified pursuant to rules 93 and 94 of the rules of civil procedure"), *abrogated on other grounds by Lane Bank Equip. Co. v.*

---

**6.** Dynex Commercial also raised these arguments in its motion for directed verdict,

which was denied.

*Smith S. Equip., Inc.*, 10 S.W.3d 308, 313 n. 3 (Tex.2000). Thus, Rule 93(2) does not require a party to allege in a verified pleading that it is not a party to the contract. *John Chezik Buick Co. v. Friendly Chevrolet Co.*, 749 S.W.2d 591, 593 (Tex.App.Dallas 1988, writ denied).

We agree the parties had contested issues of standing and capacity before the trial court.[7] However, Dynex Commercial's post-verdict motion did not challenge ART's or TCI/CMET's standing or capacity. Rather, it challenged their right to recover because they failed to obtain a finding necessary to support a judgment in their favor based on the $160 Million Commitment—specifically, a finding that they were both parties to that contract. Thus, we reject appellants' first argument, as well as appellants' related argument that the trial court improperly set aside the summary judgment it had previously entered in their favor on the standing issue.

### b. Findings as to ART and TCI/CMET

Second, appellants assert the jury's verdict included findings in favor of ART and TCI/CMET on each of the elements of their breach of contract claim. We reject ART's and TCI/CMET's second argument. As noted above, Question 1—the only question inquiring as to privity with respect to the $160 Million Commitment—named only Dynex Commercial and BCM, not ART or TCI/CMET. Thus, ART and TCI/CMET failed to obtain findings that they were parties to $160 Million Commitment.

### c. Third–Party Beneficiaries

 Third, appellants argue that ART and TCI/CMET are entitled to judgment based on Dynex Commercial's breach of the $160 Million Commitment because they are third-party beneficiaries of that contract, and thus they may recover even absent privity with Dynex Commercial. In the first count of their eighth amended petition, appellants alleged that "TCI and ART were intended beneficiaries of the $160 Million Commitment because their wholly-owned subsidiaries would own the properties and borrow the funds advanced by Dynex Commercial under the commitment."

 A third-party stranger to a contract may enforce its terms only if the contracting parties "intended to secure some benefit to that third party, and only if the contracting parties entered into the contract *directly* for the third party's benefit." *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999) (emphasis added). *See Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex.2002) (per curiam) (citing *MCI Telecomms. Corp.*, 995 S.W.2d at 651). However, parties to a contract are presumed to contract only for themselves unless it "clearly appears" that they intended a third party to benefit from the contract. *MCI Telecomms. Corp.*, 995 S.W.2d at 651. Thus, a court will not create a third-party beneficiary contract by implication. *Id.* Instead, "[t]he intention to contract or confer a *direct* benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied." *Id.* (emphasis added). Further, to qualify as an intended third-party beneficiary who can enforce the terms of a contract, the non-party must "be either a donee or creditor beneficiary of the contract, and not

---

7. Dynex Commercial raised these issues in a motion for summary judgment (before trial) and a motion for directed judgment (during trial) Additionally, before trial appellants filed a no-evidence summary judgment motion as-

serting that the Dynex entities could not prove lack of standing, specifically, that there was no real controversy between appellants and the Dynex entities. The trial court granted this motion as to the standing issue.

one who is benefited [sic] only incidentally by the performance of ... the contract." *Id.*[8]

Appellants' brief states that courts should look to "evidence outside of the actual contract terms as well as the surrounding circumstances" to decide whether contracting parties intended to contract for the benefit of a creditor or donee third-party beneficiary.[9] Appellants then point to evidence of the historical relationships between BCM and ART and/or TCI/ CMET; the testimony of Dynex Commercial's president that BCM was negotiating on behalf of its "affiliated and managed entities"; the contracting parties' dealings concerning the New Orleans Loans; and the fact that the only loan made under the $160 Million Commitment was to a TCI subsidiary. On that basis, they contend the evidence conclusively established that ART and TC/CMET were creditor third-party beneficiaries to the $160 Million Commitment.

In its post-verdict motion, Dynex Commercial specifically asserted that, based on the undisputed evidence, ART and TCI/ CMET were not third-party beneficiaries to the $160 Million Commitment; and that no question was asked on intended beneficiary status. It quoted *Republic National Bank of Dallas v. National Bankers Life Ins. Co.*, 427 S.W.2d 76, 80 (Tex.Civ.App.- Dallas 1968, writ ref'd n.r.e.), in which the court noted that "the contract in question contained no expressions or words ex-

pressly including appellant either by name or one of a specified class," and held that no third party beneficiary status existed as a matter of law. In its reply brief, Dynex Commercial asserts that ART and TCI/ CMET: (1) failed to produce sufficient evidence to raise a fact question as to whether they were third-party beneficiaries; and (2) waived any right to recover as third-party beneficiaries because they failed to submit questions as to whether they were third-party beneficiaries to the $160 Million Commitment after Dynex Commercial objected to the absence of any predicate contract and breach questions as to them.

Appellants' arguments (and Dynex Commercial's arguments here) assume that whether ART and TCI/CMET are third-party beneficiaries is a question of fact. However, as Dynex Commercial noted in its post-verdict motion, whether a contract clearly evidences an intent to bestow a direct benefit to a third party (which would permit the third party to enforce the contract) is a question of law. *Sun Oil Co. v. Employers Cas. Co.*, 550 S.W.2d 348, 349 (Tex.Civ.App.-Dallas 1977, no writ); *Cumis Ins. Soc'y, Inc. v. Republic Nat'l Bank of Dallas*, 480 S.W.2d 762, 769 (Tex.Civ.App.Dallas 1972, writ ref'd n.r.e.). This principle is buttressed by the clear holdings in *MCI Telecommunications Corp.* and *Stine* that donee or creditor third-party beneficiary status will not be

---

**8.** A donee beneficiary is one to whom the performance promised will, when rendered, come as a pure donation. *MCI Telecomms. Corp.*, 995 S.W.2d at 651. If the performance promised in the contract will inure to the benefit of a third party in satisfaction of a legal duty owed to that third party, then the third party is a creditor beneficiary. *Id.*

**9.** In support of this assertion, appellants' brief includes the following quotation: "Because the rights of third parties are involved here,

the law permits us to consider not only the circumstances surrounding the contracts' execution, but also acts and statements of the parties subsequent to the execution of the contract in determining their intentions." Appellants ascribe this quote to *Suthers v. Booker Hospital District*, 543 S.W.2d 723, 733 (Tex.Civ.App.Amarillo 1976, writ ref'd n.r.e.). They omit that the quotation is from Chief Justice Ellis's dissent in that case. *See id.* (Ellis, CJ., dissenting).

created by implication, and that unless the contracting parties' intent to confer a direct benefit to a third party is clearly and fully spelled out, the law denies the third party the right to enforce the contract. *See MCI Telecomms. Corp.*, 995 S.W.2d at 651 (citing *MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4, 12 (Tex.App.Dallas 1988, writ denied)). *See also Stine*, 80 S.W.3d at 589. "If there is any reasonable doubt as to an intent to confer a direct benefit, the third-party beneficiary claim must fail." *MJR Corp.*, 760 S.W.2d at 12. Although the contracting parties' intent to directly benefit a third-party through the performance of their contract may be a fact question, whether their *contract* clearly evidences such an intent—such as would permit the non-party to sue in order to enforce its terms—is a legal question.

▆▆▆▆ The terms of the $160 Million Commitment clearly evidence an intent to directly benefit only one group of non-contracting parties—single-asset, bankruptcy remote borrowing entities (SABREs) acceptable to Dynex Commercial. It is undisputed that ART and TCI/CMET are not SABREs and that no SABRE asserted a claim for breach of the $160 Million Commitment. Nothing in the February 16, 1998 letter or the preceding letters "clearly and fully spelled out" any intent to confer a direct benefit to ART or TCI/CMET. Indeed, the fact that ART and TCI/CMET are not SABREs means the contract clearly negates any intent to directly benefit them.[10]

Appellants also argue the contracting parties understood and intended that all the SABREs borrowing under the $160 Million Commitment would be wholly-owned subsidiaries of ART and/or TCI/CMET, and thus those two entities can sue as third-party beneficiaries for breach of

---

**10.** Even if the contracting parties' expressed intent to contract for the direct benefit of a third-party were a question of fact (a proposition that we reject), appellants' argument that we look to extraneous evidence fails for three reasons.

First, under the parol evidence rule, courts may not look outside the contract to ascertain the contracting parties' intent absent an ambiguity. *See, e.g., Sun Oil Co. (Del) v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981). No party asserts the $160 Million Commitment is ambiguous as to whether the parties intended to contract for the direct benefit of ART or TCI/CMET, and we find no such ambiguity ourselves.

Second, even if the commitment's express provision that all loans would be made to SABREs acceptable to Dynex Commercial was ambiguous, any extraneous evidence that the parties intended to provide a direct benefit to ART and TCI/CMET could do nothing more than create a fact question as to the contracting parties' intent. In that event, Dynex Commercial's waiver argument would apply, and ART's and TCI/CMET's failure to submit questions (and obtain findings) as to whether they were third-party beneficiaries would waive any rights they had to recover on

that basis. *See* Tex. Rs. Civ. P. 278, 279, 301; *Vance*, 677 S.W.2d at 482.

Third, we doubt the ambiguity exception to the parol evidence rule—that courts may consider extraneous evidence in the event of a contractual ambiguity—applies if the purported ambiguity concerns the contracting parties' intent to contract for the direct benefit of another. As discussed previously, even if the contracting parties had such an intent, they must so state it in the contract—clearly and unambiguously—or the non-contracting party will be denied the right of enforcement. *See MCI Telecomms. Corp.*, 995 S.W.2d at 651. *See also Stine*, 80 S.W.3d at 589; *Republic Nat'l Bank of Dallas*, 427 S.W.2d at 80 ("Where a stranger contends that it was intended that the provisions of a contract should inure to his benefit such intention must be clearly apparent. If mere is any doubt concerning the intent in this regard as it appears from the contract itself, such doubt should be construed against such intent"). Thus, an ambiguity as to whether the contracting parties intended to confer a direct benefit to a third party would not open the door to additional evidence on the issue; instead, it would close the door to the existence of any third-party beneficiary at all.

that commitment. This argument fails not only for the reasons mentioned previously, but also because any benefits to ART and TCI/CMET resulting from the commitment's performance would be *indirect*, not direct. The "direct benefit" requirement is clearly set forth in the Texas cases involving third-party beneficiary contract. *See MCI Telecomm. Corp.*, 995 S.W.2d at 651. *See also Stine*, 80 S.W.3d at 589; *Dallas Firefighters Ass'n v. Booth Research Group, Inc.*, 156 S.W.3d 188, 192–93 (Tex.App.Dallas 2005, pet. denied); *MJR Corp.*, 760 S.W.2d at 12. It lies at the heart of the distinction between third-parties who can enforce contracts to which they are strangers (donee and creditor beneficiaries) and those who cannot (incidental beneficiaries):

> It is commonly said that "for one to be able to avail himself of a promise in an agreement 'to which he is not a party, he must, as least, show that it was intended for his direct benefit/ in either all or part of its contemplated performance." Since the promisor has undertaken to render performance to the beneficiary, his intent to do so is usually clearly manifested.

2 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 356A (3d ed.1959) (citations and footnotes omitted). *See also* RESTATEMENT (SECOND) OF THE LAW OF CONTRACTS § 302 (1981). Thus, even if the evidence conclusively proved that Dynex Commercial and BCM intended that all SABREs borrowing under the $160 Million Commitment would be wholly-owned subsidiaries of ART or TCI/CMET (as opposed to any other real estate investment trusts managed by BCM), the resulting incidental benefits to ART and TCI/CMET do not accord them donee or creditor third-party beneficiary status. *See MCI Telecomm. Corp.*, 995 S.W.2d at 651. *See also Stine*, 80 S.W.3d at 589; *Dallas Fire-*

*fighters Ass'n*, 156 S.W.3d at 192–93; *MJR Corp.*, 760 S.W.2d at 12.

Based on its terms, we conclude as a matter of law that ART and TCI/CMET are not donee or creditor third-party beneficiaries of the $160 Million Commitment. Thus, we reject appellants' argument that ART and TCI/CMET are entitled to recover for breach of the $160 Million Commitment as third-party beneficiaries.

### d. BCM as Agent for ART and TCI/CMET

Lastly, appellants contend that ART and TCI/CMET are privy to the $160 Million Commitment because BCM was acting as their agent in entering into that agreement. Dynex Commercial responds that appellants failed to plead, prove, and obtain findings to that effect. The eighth amended petition did not allege that BCM acted as the agent of ART and TCI/CMET in signing the $160 Million Commitment. Nor was a question on agency submitted to the jury. We reject appellants' fourth argument. *See* TEX. RS. CIV. P. 278, 279, 301.

### e. Conclusion

Because ART and TCI/CMET failed to plead, prove, or obtain predicate liability findings on any theory permitting them to recover for Dynex Commercial's breach of the $160 Million Commitment, and because ART and TCI/CMET are not third-party donee or creditor beneficiaries of the $160 Million Commitment as a matter of law, the jury's findings as to their damages resulting from that breach were immaterial. *See Ramirez*, 837 S.W.2d at 413. Therefore, the trial court properly granted Dynex Commercial's post-verdict motion as to ART's and TCI/CMET's claims based on the $160 Million Commitment. We resolve appellants' first, third, and fifth issues, as they relate to ART and TCI/CMET, against them.

### 2. BCM

■ The jury found that, as a result of Dynex Commercial's breach of the $160 Million Commitment, BCM suffered $256,233 in "lost opportunity" damages, which the charge defined as "the amount of profit [BCM] could have made had [Dynex Commercial] provided funding under the $160 Million Commitment." Dynex Commercial's post-verdict motion asserted, among other things, that "lost opportunity" damages were not recoverable because they were not reasonably foreseeable by Dynex Commercial at the time it entered into the commitment. It argued that in the context of a breach of promise to lend money, lost opportunity damages are not foreseeable unless the lender knew of a specific business opportunity at the time it entered into the contract, which the borrower subsequently lost because the lender failed to make the loan. It asserted that there was no evidence of any such known, specific business opportunity that BCM was unable to consummate because of the alleged breach of the $160 Million Commitment.

The trial court granted Dynex Commercial's motion and entered a take-nothing judgment on BCM's claim. Appellants argue the trial court erred in doing so be-cause the evidence was legally sufficient to support the jury's finding.

#### a. Applicable Law

■ Consequential damages "are those damages that 'result naturally, but not necessarily, from the defendant's wrongful acts.'" *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex.1998) (per curiam) (quoting *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997)). In a breach of contract case, consequential damages are not recoverable

> unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex.1981) (citing *Hadley v. Baxendale*, 9 Ex.[ ] 341, 354 (1854)).

*Id.* In *Mead*, 615 S.W.2d at 687,[11] the supreme court stated:

> The leading case on foreseeability of contract damages is *Hadley v. Baxendale*, 9 Ex[ ]. 341, 354, [156 Eng.Rep. 145, 151] (1854) in which the English court wrote:
>
>> Where two parties have made a contract which one of them has broken, the damages which the other par-

---

**11.** The following language from *Baxendale*, found immediately after the text quoted in *Mead*, 615 S.W.2d at 687, further explains the rule with respect to the foreseeability of consequential damages such as lost profits:

> Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most,

could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract For, had the special circumstances been known, the parties might have specially provided for the breach of contract by special terms as to the damages in that case; and of this advantage it would be very unjust to deprive them. Now, the above principles are those by which we think the jury ought to be guided in estimating the damages arising out of any breach of contract....

*Baxendale*, 9 Ex. at 354–55, 156 Eng.Rep. At 151.

ty ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally; i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach [of it].

This is the rule in the majority of American jurisdictions and is recognized by the Restatement (Second) of Contracts. [footnote omitted] RESTATEMENT (SECOND) OF CONTRACTS § 351 (Tent. Draft No. 14, 1979); *see* 5 CORBIN ON CONTRACTS § 1007 (1964).

In turn, section 351(1) and (2) of the Restatement (Second) of Contracts, titled "Unforeseeability and Related Limitations on Damages," provides:

(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach

(a) in the ordinary course of events, or

(b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

RESTATEMENT (SECOND) OF CONTRACTS § 351(1), (2) (1981).[12]

■ In summary, in the event of a breach of contract to lend money, the borrower can recover consequential damages, i.e., expenses and lost profits, if the breaching lender knew, at the time it entered into the contract: (1) that the contracted financing was for a specific venture; and (2) that in the event of its breach the borrower probably would be unable to obtain other financing in a manner that would permit the borrower to carry out that venture. *See Mead,* 615 S.W.2d at 687; *Baxendale,* 9 Ex. at 354, 156 Eng.Rep. at 151; RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981).[13]

12. The comments to section 351 further discuss foreseeability in the context of a breach of contract to lend money:

Because credit is so widely available, a lender often has no reason to foresee at the time the contract is made that the borrower will be unable to make substitute arrangements in the event of breach.... In most cases, then, the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender. However, in the less common situation in which the lender has reason to foresee that the borrower will be unable to borrow elsewhere or will be delayed in borrowing elsewhere, the lender may be liable for much heavier damages based on the borrower's inability to take advantage of a specific opportunity (see Illustration 14), his having to postpone or abandon a profitable project (see Illustration 15), or his forfeiture of

security for failure to make a prompt payment (see Illustration 16).

RESTATEMENT (SECOND) OF CONTRACTS § 351 cmt. e (1981).

13. All parties cite the following language in support of their positions:

The basic common law measure of damages for breach of a loan agreement is the difference between the contractual rate of interest and the rate of interest that the borrower is required to pay to obtain the money from another source; however, special or consequential damages reasonably within the contemplation of the parties at the time the agreement was made may also be recovered....

Thus the breach of a contract to lend money to one who intended to use it for a specific business venture with the expectation of deriving a profit therefrom would give rise to recovery of damages for expenses and such net profits as the borrower

### b. Discussion

The jury's finding of $256,233 in lost opportunity damages, as defined by the charge, constitutes a finding of consequential damages.[14] One of Dynex Commercial's arguments, below and here, is that there is no evidence that, at the time it entered into the $160 Million Commitment, it was aware of either of the two prerequisites to the foreseeability of consequential damages resulting from it breach: (1) knowledge of a specific business venture that BCM was later unable to consummate as a result of Dynex Commercial's alleged breach; and (2) knowledge of special circumstances that would prevent BCM, in the event of Dynex Commercial's breach, from obtaining financing for such a transaction elsewhere. Thus, it asserts "lost opportunity" damages are not recoverable—and any finding of "lost opportunity" damages is not sustainable—because there is no evidence from which it could be concluded that "special or consequential damages [were] reasonably within the contemplation of the parties." *See Mead,* 615 S.W.2d at 687; *Baxendale,* 9 Ex. at 354, 156 Eng.Rep. at 151; RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981).

Appellants disagree. They point to the testimony of Mark Nardizzi as some evidence that Dynex Commercial knew BCM would suffer lost opportunity damages (i.e., lost profits) if it breached the $160 Million Commitment. Nardizzi was a commercial real estate broker who identified real estate assets for BCM to recommend to the

trusts for purchase. He testified that in the late summer or early fall of 1998, he had three or four properties "schooled up and ready to go," and that three of the transactions "terminated" because Dynex's financing was not available. Additionally, between late August and the end of October of 1998, Nardizzi also looked at a $257 million portfolio of properties from a Denver-based company. That portfolio did not "go under contract" and did not close because of "economics." In their reply brief, appellants also reference the report of their damage expert, Dr. Ray Perryman, which stated that "the loss of the Dynex financing has caused [appellants] to lose the opportunity to increase profits and the value of the associated real estate investment entities."

However, neither Nardizzi, Perryman, nor any other witness testified that in February 1998 (when Dynex Commercial and BCM entered into the $160 Million Commitment), either of the contracting parties was aware of any reason that would prevent BCM from timely obtaining financing from another source if Dynex Commercial breached the commitment. Absent some evidence as to the existence of—and the parties' awareness of—such special circumstances, there is no basis for awarding BCM consequential damages resulting from any breach of the $160 Million Commitment. *See Mead,* 615 S.W.2d at 687; *Lebco Constructors, Inc.,* 865 S.W.2d at 74 n. 2; *Baxendale,* 9 Ex. at 354, 156 Eng. Rep. at 151; RESTATEMENT (SECOND) OF

---

could show he would have made on the venture had the contract been performed. *Tex. Commerce Bank Reagan v. Lebco Constructors, Inc.,* 865 S.W.2d 68, 74 n. 2 (Tex.App.Corpus Christi 1993, writ denied) (citations omitted), *overruled on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 529–30 (Tex. 1998).

14. The jury found that BCM suffered no direct damages, i.e., no damages based on the difference between the contractual rate of interest and the rate of interest that BCM was required to pay to obtain money from another source. That finding is not contested on appeal.

Contracts § 351 (1981).[15] Thus, we resolve appellants' first, third, and fifth issues as they relate to BCM against them.

### 3. Conclusion

For the reasons set forth above, we conclude the trial court properly granted Dynex Commercial's post-verdict motion and disregarded the jury's damage findings based on Dynex Commercial's breach of the $160 Million Commitment. Thus, we need not address the parties' additional arguments and cross-points concerning the $160 Million Commitment.[16] *See* Tex. R.App. P. 47.1. We reject appellants' first, third, and fifth issues.

## C. The New Orleans Loans

Question 10 asked the jury whether all appellants (including TCI/CMET) and "Dynex Capital and/or Dynex Commercial" entered into an agreement regarding the New Orleans Loans. Counsel for Dynex Capital objected to the submission of Question 10, in part, because there were no allegations and no evidence that TCI/CMET was a party to the New Orleans Loans or a third-party beneficiary of the New Orleans Loans. Counsel for Dynex Commercial joined these objections. The trial court overruled the objections. Question 10 was included in the charge, and the jury answered it "yes"; the jury also found that Dynex Capital and Dynex Commercial failed to comply with the terms of the New Orleans Loans (Question 11).

Premised on an affirmative answer to Question 11, Question 12 asked: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [appellants] for their damages, if any, which resulted from such failure to comply?" The jury was instructed to consider: (1) "Lost opportunities—the amount of profit the Plaintiff could have made had the Defendant provided funding under the

---

**15.** Dynex Commercial argues there is no evidence that in February 1998, Dynex Commercial or BCM was aware of the existence of the specific ventures about which Nardizzi testified. It asserts none of those potential acquisitions were among those listed in Rossi's January 30 letter; it further assert it is undisputed that BCM never submitted proposals to Dynex Commercial on the potential acquisitions listed in Rossi's letter because financing was available elsewhere at lower rates. Appellants respond by arguing that they proved Dynex Commercial had knowledge of a specific business venture because there is undisputed evidence that "Dynex was fully aware of the business that [appellants] were in, i.e., buying, selling and investing in commercial and multi-family real estate." Thus, appellants assert the relevant "specific venture" is not the individual potential property acquisitions, but BCM's overall business of acquiring properties. However, based on the lack of evidence as to the parties' awareness of any special circumstances that would negate BCM's ability to obtain financing elsewhere, we need not address this argument.

**16.** Appellants also asserted the their expert's calculations of lost profits was based on facts in evidence; Dynex Commercial responded to the contrary, asserting that appellants' expert damage calculations wee not supported by the facts in evidence and thus that the jury's damage findings (in response to Question 6) were not supported by legally sufficient evidence, repeating an argument it made in its pretrial motion to exclude plaintiffs' experts. *See Kerr–McGee Corp. v. Helton*, 133 S.W.3d 245, 254 (Tex.2004) (expert testimony unreliable "if mere was too great an analytical gap between the data the expert relies upon and the opinion offered"); *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex.2002)(same). Appellants also assert issues, and Dynex Commercial asserts a cross-point, concerning the sufficiency of the evidence to support the jury's finding that the $160 Million Commitment was not released. Lastly, Dynex Commercial asserts in a cross-point that the evidence is legally insufficient to prove that BCM tendered performance by submitting properties to Dynex Commercial under the $160 Million Commitment. Because of our conclusions as set forth above, we need not address these arguments.

New Orleans Loans"; and (2) lost rents. In response, the jury found zero lost rent damages as to all plaintiffs; zero lost opportunity damages as to BCM, Common, Baronne, and Poydras; and $252,577 lost opportunity damages as to TCI/CMET.[17]

In their post-verdict motions, the Dynex entities challenged the jury's findings as to the New Orleans Loans. They specifically asserted that TCI/CMET was not a party to or third-party beneficiary of the New Orleans Loans, and thus had no right to recover damages for their breach. Again, the trial court granted these motions and entered a take-nothing judgment in favor of the Dynex entities with respect to all claims based on breach of the New Orleans Loans.

In their second and fourth issues, appellants contend the trial court erred in failing to render judgment in favor of TCI/CMET based on the jury's findings with respect to the New Orleans Loans. Specifically, appellants contend: (1) TCI/CMET's guarantee and the mortgage and security agreements on each of the properties were incorporated into each of the promissory notes evidencing the New Orleans Loans, making TCI/CMET a party to the contracts and the proper party to sue for their breach; (2) TCI/CMET was a third party beneficiary of the New Orleans Loans; (3) the Dynex entities waived any argument that TCI/CMET had no capacity to recover for breach of the New Orleans Loans; and (4) the evidence supported the jury's findings as to the Dynex entities' failure to comply with the New Orleans Loans and the amount of TCI/CMET's damages.

### 1. The Record

In their eighth amended petition, appellants alleged that Common, Baronne, and Poydras were "single-asset entities" formed to own the New Orleans properties and "to be the borrowers of the Dynex financing—and ultimately were the borrowers named in the loan papers." They pleaded that the terms and conditions of the New Orleans Loans were "memorialized in certain promissory notes entered into by and between Dynex Commercial and Common, Baronne, and Poydras .... "Further, they alleged that" Dynex Commercial and Dynex Capital wrongfully refused to reimburse the New Orleans borrowers for tenant improvement expenses Common, Baronne, and Poydras were entitled to increase [sic] of up to $6.4 million, collectively, under the terms of the New Orleans Loans."

Evidence of the New Orleans Loans included the promissory notes themselves, which were identical except for the name of the borrower and the amount of the loan. The notes named Continental, Baronne, and Poydras (respectively) as the "Borrower," and stated that "Borrower has the right to additional advances hereunder ..." Such additional advances included those "made to fund tenant improvements ...."

### 2. Discussion

#### a. TCI/CMET as Party

The Dynex entities asserted below and here that appellants failed to plead that TCI/CMET was a party to the New Orleans Loans, and that there is no evidence to support the jury's finding that it was a party. We agree.

Appellants' operative pleading asserts a claim on behalf of TCI/CMET for breach of the New Orleans Loans. However, they did not allege that TCI/CMET was a party to those loans. Further, it is undisputed that the borrowers under the New Orleans Loans (respectively) were Common, Bar-

. None of the zero damage findings are challenged on appeal.

onne, and Poydras. They—not TCI/CMET—were entitled to receive any additional advances, such as advances for tenant improvements.

Appellants' brief recounts the evidence of TCI/CMET's involvement in the matters leading up to the execution of the New Orleans Loans, including the fact that it signed the loan commitment preceding the execution of the New Orleans Loans. Appellants also point out that TCI/CMET guaranteed a portion of the payments owed under the New Orleans Loans. However, this is not evidence that TCI/CMET was a party to the contracts that were allegedly breached—the New Orleans Loans. TCI/CMET's guaranty of a portion of the borrowers' payments under the New Orleans Loans does not make it a party to those loans themselves. *See Fed. Deposit Ins. Corp. v. Coleman,* 795 S.W.2d 706, 710 (Tex.1990). This conclusion is not changed by the fact that the "terms, covenants, and conditions" contained in the security and guaranty agreements were incorporated into the terms of the respective notes evidencing the New Orleans Loans.

As discussed above with respect to the $160 Million Commitment, one of the elements of a claim for breach of contract is the existence of a valid contract between the plaintiff and the defendant. *See Barnett,* 123 S.W.3d at 815. Because TCI/CMET did not plead or present any evidence that it was a party to the New Orleans Loans, we reject appellants' argument that the trial court erred in disregarding the jury's damage award as to TCI/CMET because there was legally and factually sufficient evidence that it was a party to the New Orleans Loans. *See Ramirez,* 837 S.W.2d at 413.

*b. TCI/CMET as Third–Party Beneficiary*

Appellants also argue TCI/CMET was a third-party beneficiary of the New Orleans Loans, and was thus entitled to sue for their breach even though it was not a party to those contracts. We discussed the legal requirements related to third-party donee and creditor beneficiaries in our discussion of the $160 Million Commitment above, and do not repeat that discussion here. The terms of the New Orleans Loans do not evidence a clear intent to benefit TCI/CMET. *See Stine,* 80 S.W.3d at 589; *MCI Telecomms. Corp.,* 995 S.W.2d at 651. Based on the terms of the New Orleans Loans, we conclude as a matter of law that TCI/CMET are not donee or creditor third-party beneficiaries to the New Orleans Loans.

*c. Waiver of Argument as to TCI/CMET's Capacity*

Appellants argue that the Dynex entities waived any arguments they had as to whether TCI/CMET had standing or capacity to sue on the New Orleans Loans. This argument is identical to the appellants' arguments with respect to the $160 Million Commitment. They fail here for the same reason. The Dynex entities post-verdict motions did not challenge TCI/CMET's standing or capacity, but its failure to obtain a finding necessary to support a judgment in its favor based on the New Orleans Loans—specifically, that it was a party to those loans. *See Barnett,* 123 S.W.3d at 815.

3. Conclusion

For the reasons set forth above, we conclude the trial court properly granted the Dynex entities' post-verdict motions and disregarded the jury's damage finding in favor of TCI/CMET based on the New Orleans Loans. Thus, we need not address appellants' remaining arguments—and the Dynex entities' cross-point—concerning the sufficiency of the evidence to support the amount of such damage find-

ing, and Dynex Commercial's cross-point relating to whether there is legally sufficient evidence that it breached the New Orleans Loans. *See* Tex.R.App. P. 47.1.

We resolve appellants' second and fourth issues against them.

## IV. RENDITION OR REMAND

■ In their eighth issue, appellants argue that if they are not entitled to judgment on the jury's verdict with respect to the $160 Million Commitment, the trial court erred by entering a take-nothing judgment instead of ordering a new trial. Appellants contend they relied on the trial court's summary judgment ruling on standing and waiver of any challenge to capacity in submitting their issues to the jury:

> Because it would be unfair to penalize plaintiffs for relying upon the trial court's ruling that Dynex's argument on standing was already decided as a matter of law, the case should be remanded for a new trial. As a result, even if this Court finds that any of the aforementioned jury questions were erroneous, the trial court erred in rendering a judgment for Dynex, and respectfully, this Court should order a new trial.

With respect to BCM's claim, Dynex Commercial's post-verdict motion was directed to the sufficiency of the evidence to support the jury's damage finding. Thus, appellants' argument is inapplicable to BCM's cause of action for breach of the $160 Million Commitment.

With respect to ART and TCI/CMET's claims, we have noted above that Dynex Commercial's post-verdict motion did not attack ART's and TCI/CMET's standing or capacity to sue. Rather, it asserted the same argument it made at the charge conference—that the charge omitted any predicate liability findings for ART and TCI/CMET's breach of contract claims.

Appellants rely principally on two cases in support of their argument for remand. In *R.R. Street & Co. v. Pilgrim Enterprises, Inc.*, 166 S.W.3d 232, 237 (Tex.2005), the trial court refused—over the defendant's objection—to submit to the jury several elements of a claim for "arranger liability" under the Texas Solid Waste Disposal Act (SWDA), instead finding those issues in the plaintiff's favor as a matter of law. The supreme court reversed, finding a fact issue existed as to some of those elements. The defendant asked the supreme court to render judgment in its favor, arguing that the plaintiff had waived recovery by failing to request jury questions as to those factually disputed elements, citing Texas Rule of Civil Procedure 279. Without deciding whether rendition would otherwise be appropriate under Rule 279, the supreme court noted that the trial court's action effectively withdrew the SWDA claim from the jury and that "no appellate court had written about the proper submission of a SWDA claim when the case was tried...." *Id.* at 255. Thus, the supreme court remanded the case in the interest of justice. *Id.* at 254 (citing Texas Rule of Appellate Procedure 60.3 and *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 840 (Tex.2000)).

Similarly, in *Torrington Co.*, 46 S.W.3d at 833, the supreme court held that a broad-form negligence issue erroneously omitted certain elements of the plaintiff's negligent undertaking claim. Again, however, the supreme court remanded the claim in the interest of justice because "neither this Court nor any other appellate court had written about the proper submission of an undertaking claim at the time this case was tried...." *Id.* at 841. In doing so, the court distinguished *Torrington* from another case in which it did not remand in the interest of justice, *Clay-*

ton W. Williams, Jr., Inc. v. Olivo, 952 S.W.2d 523 (Tex.1997):

> We did not [remand] in Olivo, because the distinction between premises liability claims and negligent activity cases, and the requirement that the Corbin [v. Safeway Stores, Inc., 648 S.W.2d 292 (Tex.1983)] elements be submitted in premises liability cases, were well established by the time the case was decided. See Olivo, 952 S.W.2d at 530 (Spector, J., dissenting); Keetch v. Kroger Co., 845 S.W.2d 262 (Tex.1992). But we have remanded in the interest of justice when our decisions have altered or clarified the way in which a claim should be submitted to the jury. See, e.g., L.M.B. Corp. v. Gurecky, 501 S.W.2d 300, 303 (Tex.1973); Scott v. Liebman, 404 S.W.2d 288, 294 (Tex.1966).

Id. at 840.

We find the circumstances here in line with those in Olivo, and not R.R. Street & Co. or Torrington Co. It cannot be argued that the privity element of a breach of contract claim is not well-established. Nor can we conclude that the interests of justice require that ART and TCI/CMET be given a second chance to try their claims against Dynex Commercial based on the $160 Million Commitment.

Further, the rules of appellate procedure applicable to this court provide:

> When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when:
>
> (a) a remand is necessary for further proceedings; or
>
> (b) the interests of justice require a remand for another trial.

TEX.R.APP. P. 43.3 (emphasis added). Here we are not reversing the trial court's judgment, but affirming the trial court's judg-

ment entered notwithstanding the jury's verdict.

Accordingly, we resolve appellants' eighth issue against them. See id.; Olivo, 952 S.W.2d at 530.

## V. ATTORNEY'S FEES, INTEREST, AND COSTS

In their sixth issue, appellants contend that legally sufficient evidence supported the jury's findings regarding the award of attorney's fees to BCM, ART, and TCI/CMET. In their seventh issue, appellants contend they were entitled to pre- and post-judgment interest and costs.

Because we have concluded the trial court did not err in rendering judgment against appellants on their claims for breach of the $160 Million Commitment or breach of the New Orleans Loans, we conclude further they are not entitled to attorney's fees. See TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997). Because they are not the successful parties here, appellants are not entitled to costs. See TEX.R. CIV. P. 131. Thus we resolve appellants' sixth and seventh issues against them.

## VI. CONCLUSION

Having resolved appellants' eight issues against them, we affirm the trial court's final judgment.