**Mary Lou SHEEHAN, Appellant/Cross-Appellee,**

v.

**Bruce E. ADAMS, Sammi J. Adams, Appellees,**

**and**

**Lori Arnold d/b/a Coldwell Banker Apex Realtors, Appellee/Cross-Appellant.**

**No. 05–08–01340–CV.**

Court of Appeals of Texas, Dallas.

Aug. 16, 2010.

Chad Michael Ruback, The Ruback Law Firm, Dallas, TX, for Appellant/Cross–Appellee.

Russell H. Daniels, Bush & Motes, PC, Arlington, TX, Steven K. Terry, Newsom, Terry & Newsom, L.L.P., Dallas, TX, for Appellee/Cross–Appellant.

Before Justices MORRIS, LANG, and MURPHY.

## OPINION

Opinion By Justice MURPHY.

We must determine in this appeal whether legally sufficient evidence supports a jury's statutory fraud and DTPA verdict in favor of Mary Lou Sheehan, the purchaser of a twenty-year old house located in Mesquite, Texas. Applying well-established law that a vital fact may not be established by piling inference upon inference, we conclude the evidence was legally insufficient to support the verdict. Accordingly, the trial court did not err when it granted a judgment notwithstanding the verdict. The trial court also did not abuse its discretion in failing to award appellate attorney's fees to cross-appellant Lori Arnold d/b/a Coldwell Banker Apex Realtors. We affirm the trial court's judgment.

## I. BACKGROUND

In April 2002, Sheehan contacted Bethena Smith, a real estate agent associated with Coldwell Banker, to represent her in the purchase of her first house. Coldwell Banker is a real estate services firm. Around that same time, Bruce and Sammi Adams listed their house with Walter Cole, a real estate agent who was also associated with Coldwell Banker.

After twice visiting the Adamses' house in May 2002, Sheehan signed a purchase contract. Pursuant to the contract, the Adamses delivered the "Seller's Disclosure Notice" as required by section 5.008 of the Texas Property Code. *See* TEX. PROP.CODE ANN. § 5.008 (Vernon Supp. 2009). Bruce filled out the seller's disclosure, checking the box indicating he and Sammi were unaware of any defects or malfunctions in the foundation, walls, floors, ceilings, or roof. He further indicated that the only condition of which they were aware was "Settling." Next to the box where he checked "Yes" for settling, Bruce inserted a handwritten comment in which he characterized the settling as "NORMAL."

After he filled out the seller's disclosure but before the house was inspected, Bruce called Cole about a "hairline crack" in the brick on the west side of the exterior of the house (the west-side crack). Pursuant to their discussion, Bruce made no changes to the disclosure.

Sheehan hired Randal Duncan, a licensed house inspector with All Pro Inspections, to perform the inspection. Sheehan's primary concern for Duncan

was the foundation because of the disclosure that the house had "normal" settlement. Duncan inspected the Adamses' house on May 9, 2002 and, after a three-hour inspection, delivered a report to Sheehan. The Adamses, Sheehan, and Smith were present for the inspection, during which Duncan noticed some exterior cracks in the brick of the house. He did not note them on his report because he considered them normal for a house of that age. Duncan told Sheehan he found no problems with the foundation. His report specifically included the notation that the foundation was inspected and "[t]here were no signs of significant cracks or movement noted in the foundation at this time." He did note roof and termite issues and recommended that Sheehan consult with a roofer. Sheehan signed the inspection agreement and termite report. Based on the inspection report, the parties amended the contract to require the Adamses to pay the roof repair cost.

Sheehan, with Smith present, conducted a final walk-through on May 15, 2002, the day before closing. Sheehan then signed the "Buyer's 'Walk Thru' and Acceptance Form," acknowledging her inspection of the property and noting the specific repairs, such as the roof replacement, to be completed before closing. She saw no cracks in the house's interior and admitted she never looked at the exterior. The acceptance form included a notice that the "real estate brokers and the Seller have no knowledge of any defects in the Property other than what has been disclosed in the Seller's Disclosure Notice or other written information."

Closing was finalized May 16, 2002, and Sheehan moved in on May 29, 2002. In August 2002, Sheehan discovered cracks in the interior and exterior walls of the house. In an e-mail to Smith dated August 12, 2002, Sheehan wrote:

I just discovered some huge cracks in the walls in my bedroom and ceiling of the living room. I went outside and there is about a 3 foot vertical crack in the brick outside my bedroom wall. I'm pretty sure that it just happened. But isn't this something that Randall Duncan should have been able to check out?

Sheehan wrote she was "very upset" and asked Smith what she should do. Smith responded that a "brick crack" in this "dry, hot weather" is not uncommon and recommended Sheehan hire a foundation expert. Smith also recommended that Sheehan follow a watering program "to keep the foundation stable."

Two weeks later, on August 25, 2002, Sheehan received a proposal from Power Lift Foundation Repair, Inc. to perform foundation work. Power Lift estimated it would cost Sheehan $10,475 to "Halt settlement" and "Regain elevation as practical." Power Lift also noted a recommendation: "Implement watering system to maintain consistent moisture level around perimeter of foundation."

Sheehan also hired a geotechnical engineer, Edward Scoular, to assess the condition of the foundation. Scoular was a principal with Independent Foundation Engineers, Inc., a firm that specialized in evaluating foundations. Scoular prepared a report dated September 20, 2002, noting cracks in the mortar and brick, wall and ceiling sheetrock, and the foundation. Scoular did not offer an opinion as to when the foundation actually failed. Thereafter, Sheehan received a second proposal to fix the foundation, prepared by Ram Jack of Texas, Inc. On November 20, 2002, Power Lift also provided Sheehan with a revised proposal, which incorporated Scoular's recommendations.

Sheehan originally made written demand on the Adamses and Duncan seeking payment for foundation repairs. After fil-

ing suit, she settled her claims against Duncan and All Pro, and those claims were dismissed.

Sheehan sued the Adamses and Arnold, alleging violations of the Texas Deceptive Trade Practices and Consumer Protection Act, fraud, breach of contract, and breach of fiduciary duty. All allegations were premised on a claim the house had a foundation problem that was both misrepresented and not disclosed. After the jury returned a verdict in favor of Sheehan, the trial court granted motions for JNOV by the Adamses and Arnold and rendered judgment that Sheehan take nothing on her claims. The judgment also included an award of attorney's fees in favor of Arnold and against Sheehan through trial. The trial court made no findings of fact, however, regarding appellate fees and concluded Arnold was not entitled to such recovery.

Both Sheehan and Arnold appeal the trial court's judgment. In Sheehan's first issue, she contends the trial court erred in granting the motions for JNOV because the record contains legally sufficient evidence to support the jury's findings that the Adamses violated the DTPA and the Adamses and Arnold committed statutory fraud.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

■ A judgment notwithstanding the verdict is proper when (1) there is no evidence to support one or more of the jury findings on issues necessary to liability, or (2) a legal principle precludes recovery. *Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003) (per curiam); *John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex. App.-Houston [1st Dist.] 1992, writ denied).

■ We review challenges to a trial court's ruling on a motion for JNOV under the same legal-sufficiency test applied to appellate no-evidence challenges. *City of Keller v. Wilson,* 168 S.W.3d 802, 822–23, 827 (Tex.2005). Under that standard, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id.* at 822. We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. If more than a scintilla of probative evidence supports the finding, the legal sufficiency challenge fails. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 233 (Tex.2004). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). In contrast, evidence that creates no more than "a mere surmise or suspicion of its existence" is only a scintilla and, thus, no evidence. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983)); *see also Lozano v. Lozano,* 52 S.W.3d 141, 148 (Tex.2001) (per curiam) (Phillips, C.J., concurring and dissenting) (if evidence is "so slight that any plausible inference is purely a guess, it is in legal effect no evidence").

■ A jury's verdict or finding may be based on inferences that are fairly drawn from the facts in evidence. *Briones v. Levine's Dep't Store, Inc.,* 446 S.W.2d 7, 10 (Tex.1969); *see also Lozano,* 52 S.W.3d at 149 (circumstantial evidence may be used to establish any material fact). A vital fact, however, may not be established by piling inference upon inference. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 858 (Tex.1969); *see also Rounsaville v. Bullard,* 154 Tex. 260, 276 S.W.2d 791, 794

(1955). Thus, "facts from which an inference may properly be drawn must be established by direct evidence, not by other inferences." *Entex, A Div. of Noram Energy Corp. v. Gonzalez,* 94 S.W.3d 1, 8 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (citing *Rounsaville,* 154 Tex. 260, 276 S.W.2d at 794).

## III. DISCUSSION

### A. JNOV in favor of Bruce and Sammi Adams

Sheehan relies on the same evidence to support her argument the evidence was legally sufficient to support both the jury's DTPA and statutory fraud findings against the Adamses. Those claims are based solely on the seller's disclosure notice of "normal" settling and the indication of no significant problems with the foundation.

Sheehan first contends the jury could infer from the evidence that a west-side crack on the exterior of the house, coupled with interior cracks that were repaired, were symptoms of foundation problems and abnormal settling. From those inferences, she suggests the jury could reasonably infer the Adamses violated the DTPA by representing the house had characteristics which it did not have and that the house was another grade, quality, or standard than the one represented. Similarly, Sheehan argues the jury could reasonably infer from the inferences of foundation problems and abnormal settling that the Adamses made false statements.

She begins by relying on testimony of the Adamses about interior cracks they hired construction workers to repair in early 2002 and the testimony of one of the workers, Gary Ratliff. Ratliff described "a lot of cracks" and that the cracks were "not normal for movement of just a house." He testified he repaired about twenty cracks on all sides of the interior of the house and described the work as a major house repair. He also said he saw three hairline cracks in the foundation before Sheehan purchased the house. There was no photographic evidence of any of the cracks he described, and he testified that when he saw the house several years later, the condition of the house was 80% worse than his first visit.

Sheehan also relies on testimony about the west-side crack. Bruce and Sammi testified they knew about the west-side crack and that Bruce had been aware of it for four years. Sheehan places significance on a telephone call between Bruce and Cole after Bruce completed the disclosure notice but before the inspection. After describing a "hairline" crack on the exterior of the house that had not "done anything for four years," Cole told him such a crack was not "unusual for a house that age" and explained that the inspector would see it and make any recommendations for a foundation company or engineer to look at the house. Sheehan maintains Bruce "was apparently concerned" about the settling representations and asked Cole whether they should amend the seller's disclosure notice "in light of the crack on the outside of the house." She argues that despite knowing about the west-side crack, the Adamses nevertheless represented in the seller's disclosure that the house had no foundation problems and the settling was "normal." Sheehan testified she would not have bought the house had she known about the foundation problems.

Sheehan had no photographic evidence that depicted the cracks on the day she moved into her house. She did not take a picture of the west-side crack until October 2, 2002, nearly two months after she first saw the crack in August 2002. The October 2002 photograph of the west-side crack was offered as Exhibit 46 and will be referred to as such.

## 1. DTPA Claims

■ The jury was asked whether Bruce and Sammi Adams engaged in "any false, misleading, or deceptive act or practice that [Sheehan] relied on to her detriment and that was the producing cause" of her damages. The jury was instructed that a "[f]alse, misleading, or deceptive act or practice" means any of the following: (1) "Representing that the house is or will be of a particular standard, quality, or grade if it is of another" (TEX. BUS. & COM.CODE ANN. § 17.46(b)(7) (Vernon Supp. 2009)); (2) "Representing that the house would have characteristics that it did not have" (*id.* § 17.46(b)(5)); or (3) "Failing to disclose information about the house that was known at the time of the transaction with the intention to induce [Sheehan] into a transaction she otherwise would not have entered into if the information had been disclosed" (*id.* § 17.46(b)(24)) [Question No. 5]. If they answered "Yes" to question five, the jury was then asked whether the Adamses engaged in such conduct knowingly, meaning they had "actual awareness of the falsity, deception, or unfairness" of the act or practice. [Question No. 6].

■ To prevail on a DTPA claim, Sheehan had to establish the Adamses violated a specific provision of the Act, that the violation was a producing cause of her injury, and that she relied on the false, misleading, or deceptive act or practice to her detriment. *Id.* § 17.50(a)(1); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex.1996). The Adamses cannot be held liable under the DTPA for "failing to disclose information [they] did not actually know." *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex.1995); *see also Pfeiffer v. Ebby Halliday Real Estate, Inc.*, 747 S.W.2d 887, 889–90 (Tex.App.-Dallas 1988, no pet.). That is because under section 17.46(b)(24), the failure to disclose information requires the Adamses to have known the information at the time of the transaction and failed to bring it to Sheehan's attention. TEX. BUS. & COM.CODE ANN. § 17.46(b)(24). Proof that the Adamses should have known the information is not enough. *Prudential Ins. Co.*, 896 S.W.2d at 162; *Rich v. Olah*, 274 S.W.3d 878, 887 (Tex.App.-Dallas 2008, no pet.).

No witness testified to seeing the crack as it appeared in Exhibit 46 in April or May 2002. Specifically, Sheehan, Smith, and Cole all testified they saw no exterior cracks in April or May 2002. The Adamses testified they knew about the west-side crack, but at that time, it was just a small hairline crack, too thin to insert a piece of paper. Bruce testified it had not changed much in four years. Duncan also testified he saw a crack in the brick, but it was just a small crack that did not otherwise alarm him or require notation on his inspection report.

Sheehan's experts all testified that a crack does not necessarily evince a foundation problem without more. Scoular testified that foundations can bend and flex, and that such bending can cause cracks. Scoular also testified that if all that existed was a hairline crack and nothing else, this would be a minor issue. He affirmed that foundations can fail within weeks. Similarly, Phillip Carter, a vice president of Ram Jack, testified foundation movement that causes cracks does not necessarily mean the foundation itself has cracked. Sheehan never noticed any cracks after the time she moved into her house, and when she e-mailed Smith in August of 2002, she indicated the cracks "just happened."

The Adamses testified they repaired two cracks in the house's interior and fixed some bedding and taping in spots on the vaulted ceilings. Ratliff testified to mak-

ing the repairs. While Ratliff characterized the interior repairs as "major," no witness agreed that his testimony was accurate. Even considering the repairs as major, neither Ratliff nor any other witness connected those interior repairs or visual cracks to a foundation failure at the time the repairs were completed in early 2002. *See Pfeiffer*, 747 S.W.2d at 890 (previous repairs and problems without evidence of the relationship to "foundation problems" insufficient). Scoular testified he saw signs of repairs, but he was unsure when the repairs were made and did not opine as to when the foundation actually failed.

Sheehan admits the only representations that form the basis of her DTPA complaints were those made by Bruce when he filled out the seller's disclosure notice. Section 5.008 of the Texas Property Code requires the seller to complete the notice "to the best of seller's belief and knowledge as of the date the notice is completed. . . ." TEX. PROP.CODE ANN. § 5.008(d). Bruce indicated on that notice that neither he nor Sammi were aware of any defects or malfunctions with the foundation, but they were aware that "normal" settling had occurred. The seller's disclosure form also included a notice that it was a "DISCLOSURE OF SELLER'S KNOWLEDGE OF THE CONDITION OF THE PROPERTY" as of the date signed and that it was "NOT A SUBSTITUTE FOR ANY INSPECTIONS OR WARRANTIES" buyer might wish to obtain. The disclosure form further contained the notice that it was "NOT A WARRANTY OF ANY KIND BY SELLER, SELLER'S AGENTS, OR ANY OTHER AGENT." Bruce and Sammi each signed the disclosure on April 24, 2002; Sheehan signed on May 14, 2002. Immediately above the parties' signatures, the disclosure included an additional notice to the buyer: "YOU ARE ENCOURAGED TO HAVE AN INSPEC-

TOR OF YOUR CHOICE INSPECT THE PROPERTY."

In disclosing facts to a buyer, a seller is charged only with disclosing those material facts that "put a buyer exercising reasonable diligence on notice of the condition of the house." *Cole v. Johnson*, 157 S.W.3d 856, 860 (Tex.App.-Fort Worth 2005, no pet.). The evidence shows Bruce's disclosure of "settling" had an effect on Sheehan; she testified that this disclosure raised a "red flag" about the foundation. In fact, she hired Duncan to perform an inspection, and the first thing she asked him when he finished was whether he saw any problems with the foundation.

The Adamses knew the house experienced settling. Yet there is no direct evidence of a defect in May 2002; and there is no evidence either Bruce or Sammi Adams actually knew, based on the nature of the cracks as they existed at the time, that the settling was abnormal or that an actual defect existed. Rather, Cole agreed that based on what he saw in the house, "normal" was a good word to use. Ratliff's testimony that he saw three hairline cracks in the foundation and that the interior cracks were "not normal" house movement is insufficient evidence to support a finding of the Adamses' knowledge of a defective condition or abnormal settling prior to Sheehan's purchase. *See Pfeiffer*, 747 S.W.2d at 890.

Moreover, the Adamses never represented to Sheehan that the foundation was in good condition. Instead, they checked the box indicating they were unaware of any foundation defects or malfunctions. Sheehan's own inspector, Duncan, was the only person who offered an opinion, after his inspection, that there were no problems with the foundation.

The jury's findings may be upheld without direct evidence as long as the conclusion may fairly and reasonably be inferred from the facts. *See Briones,* 446 S.W.2d at 10; *Lozano,* 52 S.W.3d at 149 (circumstantial evidence may be used to establish any material fact). Here, no witness opined the foundation had a defect or malfunction in May 2002. Sheehan's position requires the jury to infer first that a foundation defect or malfunction existed in May 2002. Then, from knowledge of a hairline crack and interior repairs, the jury had to infer that the Adamses must have known the foundation was broken at the time they sold the house to Sheehan. This vital fact may not be established by piling inference upon inference. *See Schlumberger Well Surveying Corp.,* 435 S.W.2d at 858. Not even Sheehan's own expert opined as to when the foundation failed. While Ratliff testified he saw hairline foundation cracks at the time he performed the interior repairs, he testified he did not inspect the foundation. Nor did his testimony establish a foundation failure at that time. Without any direct evidence, the multiple inferences the jury was required to draw to reach its verdict that the Adamses misrepresented a foundation defect are, in effect, no evidence. *See id.; see also Ford Motor Co.,* 135 S.W.3d at 601 (mere surmise or suspicion is no evidence).

For Sheehan to recover on her claim the Adamses failed to disclose a foundation defect, she must show the facts the Adamses failed to disclose were material. *Pfeiffer,* 747 S.W.2d at 889. As demonstrated, the record is void of any direct evidence of omission of a material fact, and Sheehan cannot support a verdict built only on inferences. *Schlumberger,* 435 S.W.2d at 858. The facts disclosed actually raised "red flags" to Sheehan that there could be foundation problems, and she acted on the disclosure by hiring, directing,

and questioning her inspector specifically about her concern. Even if direct evidence supported the inference the Adamses knew of a problem, Sheehan points to no evidence that the west-side crack as shown in Exhibit 46 existed in May 2002. Of those who actually noticed a crack, they all described it as "hairline." The hairline crack and interior repairs are not evidence Bruce or Sammi knew of a foundation failure at that time or that the settling disclosed was anything but normal. One cannot be held liable under the DTPA for failure to disclose facts they do not know. *Pfeiffer,* 747 S.W.2d at 890 (citing *Robinson v. Preston Chrysler–Plymouth, Inc.,* 633 S.W.2d 500, 502 (Tex.1982)).

We conclude the evidence is legally insufficient to support the jury's finding in question five that Bruce and Sammi Adams violated a provision of the DTPA. Because the jury's answer to question six was conditioned on an affirmative finding in question five, we do not reach the question of whether the evidence supports a finding that Bruce and Sammi knowingly engaged in a false, misleading, or deceptive act or practice. We turn to the question of whether the evidence is legally sufficient to support the jury's finding of statutory fraud.

### 2. Statutory Fraud

Like Sheehan's DTPA claims, her statutory fraud claim is premised on the representations Bruce made in the seller's disclosure statement. To recover for fraud under section 27.01 of the Texas Business and Commerce Code, Sheehan had to show the Adamses made a false representation of a past or existing material fact, to her, for the purpose of inducing her to enter into a contract and that she relied on the false representation in entering into that contract. TEX. BUS & COM. CODE ANN. § 27.01(a)(1) (Vernon 2009). "[P]ure expression[s] of opinion will not

support an action for fraud." *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). Whether a statement is an actionable statement of "fact" or merely one of "opinion" depends on the circumstances in which the statement is made. *Transp. Ins. Co.*, 898 S.W.2d at 276.

Sheehan again argues if the jury inferred the interior and exterior cracks are symptoms of foundation problems and abnormal settling, it would be reasonable for the jury to have inferred that the representations related to the foundation and normal settlement were false. Further, because the Adamses were trying to sell their house, the jury could reasonably infer they made the representations for the purpose of inducing Sheehan to buy their house.

Under section 5.008 of the Texas Property Code, the Adamses are required to complete the form to the best of their belief and knowledge. TEX. PROP.CODE ANN. § 5.008(d). The notice provisions on the disclosure that both the Adamses and Sheehan signed warned further that the disclosure was based on the seller's knowledge of the condition of the property and was not a warranty of any kind, was not a substitute for any inspections, and the buyer was encouraged to have an inspector of buyer's choice inspect the property. As described above, Sheehan offered no direct evidence of a material defect existing in May 2002 or that the Adamses' "belief and knowledge" as to the settling was false. There was also no evidence that the Adamses intended anyone who read the disclosure to fail to inspect the property in reliance on the disclosure of "normal" settling. Rather, Bruce was told by Cole that the inspector would follow up on the disclosure, and Sheehan read the disclosure to see if anything "stood out." The words "settling" and "normal" caused Sheehan to take actions to determine what the language meant and to assure herself no foundation problems existed.

Reviewing this record in the light most favorable to the jury's verdict, we cannot conclude more than a scintilla of probative evidence supports the finding that the Adamses made a false representation of a past or existing material fact on which Sheehan relied. Without any direct evidence, the multiple inferences Sheehan cites to support her verdict amount to no more than mere suspicion and, thus, no evidence. *Ford Motor Co.*, 135 S.W.3d at 601. We therefore conclude the evidence in support of Sheehan's statutory fraud claim is legally insufficient. Because the evidence in support of Sheehan's DTPA and statutory fraud claims is legally insufficient, we conclude the trial court correctly granted a judgment notwithstanding the verdict in favor of the Adamses.

### B. JNOV in favor of Lori Arnold

Sheehan's claims against Arnold are premised on Arnold's liability for the conduct of Cole. TEX. OCC.CODE ANN. 1101.803 (Vernon 2009) (broker is liable for "any conduct engaged in ... by a salesperson associated with or acting for the broker"). Cole affiliated his real estate agent's license with Arnold's broker's license and was associated with Coldwell Banker. Sheehan asserts Arnold, through her agent Cole, committed fraud because Cole "didn't disclose known defects in the house."

In question eight, the jury was asked whether Cole committed statutory fraud against Sheehan. *See* TEX. BUS. & COM. CODE ANN. § 27.01(d). Answering that question, however, was conditioned on an affirmative answer that the Adamses committed statutory fraud. Because we conclude there is legally insufficient evidence

to support the jury's finding that Bruce and Sammi Adams committed statutory fraud, question eight must be disregarded. Accordingly, the trial court properly granted a judgment notwithstanding the verdict in favor of Arnold.

Sheehan's second issue concerning attorney's fees is also contingent. Because we have resolved Sheehan's first issue against her, we do not reach issue two. TEX.R.APP. P. 47.1.

### IV. CROSS–APPEAL

 By cross-appeal, Arnold asserts under a legal sufficiency standard that she conclusively established all vital facts in support of her recovery of appellate attorney's fees, and the trial court abused its discretion in failing to award those fees. It is Arnold's burden to bring a record showing the trial court abused its discretion. *See Sanchez v. AmeriCredit Fin. Servs., Inc.,* 308 S.W.3d 521, 526 (Tex. App.-Dallas 2010, no pet.).

Here, Arnold fails to identify where in the record she made a legal claim for attorney's fees. *See* TEX.R.APP. P. 38.1(i) (the brief must contain clear and concise argument for contentions made, with appropriate citations to authorities and record). The record also fails to show a pleading in which she ever requested attorney's fees. *See* TEX.R. CIV. P. 301 (trial court's judgment must conform to pleadings); *see also Ex parte Fleming,* 532 S.W.2d 122, 123 (Tex.Civ.App.-Dallas 1975, no writ) (court's jurisdiction to render judgment is invoked by pleadings; judgment unsupported by pleadings is void). Additionally, we do not know the basis for the trial court's denial of appellate attorney's fees. *See Sanchez,* 308 S.W.3d at 526. And we must presume that a trial court acted within its discretion unless the record discloses the contrary. *Navistar*

*Int'l Corp. v. Valles,* 740 S.W.2d 4, 6 (Tex. App.-El Paso 1987, no writ).

On this record, we cannot conclude the trial court abused its discretion by failing to award appellate fees. We overrule Arnold's cross-point.

### V. CONCLUSION

Having overruled Sheehan's issues and Arnold's cross-point, we affirm the judgment of the trial court.