Affirm in part; Reverse and Remand in part; Opinion Filed February 13, 2013.



In The

# Court of Appeals
## Fifth District of Texas at Dallas

No. 05-04-01358-CV

**BASIC CAPITAL MANAGEMENT, INC., AMERICAN REALTY TRUST, INC., TRANSCONTINENTAL REALTY INVESTORS, INC., CONTINENTAL POYDRAS CORP., CONTINENTAL COMMON, INC., AND CONTINENTAL BARONNE, INC., Appellants**

V.

**DYNEX COMMERCIAL, INC. AND DYNEX CAPITAL, INC., Appellees**

On Appeal from the 68th Judicial District Court
Dallas County, Texas
Trial Court Cause No. 03-00675

# OPINION ON REMAND

Before Chief Justice Wright and Justices Moseley and Lang
Opinion By Justice Moseley

Appellants sued appellees for damages resulting from the alleged breach of a commitment to provide financing totalling $160 million for future real estate investments (the "Commitment") and for failing to advance funds under three promissory notes (the "New Orleans Loans"). The trial court granted appellees' motion for judgment notwithstanding the jury's verdict.

This is the second time this case has been before the Court. In the first appeal, we determined that appellants American Realty Trust, Inc. (ART) and Transcontinental Realty Investors, Inc.

(TCI/CMET)[1] were not direct, third party beneficiaries of the Commitment; that TCI/CMET was not a direct, third-party beneficiary of the New Orleans Loans; and that appellant Basic Capital Management, Inc. ("Basic") could not recover lost profits as consequential damages for Dynex's breach of the Commitment because they were not foreseeable. *Basic Capital Management v. Dynex Commercial Inc.*, 254 S.W.3d 508 (Tex. App.—Dallas 2008, pet. granted, reversed) (*Basic I*). As a result, we affirmed the trial court's judgment.

The Texas Supreme Court disagreed with each of the above determinations, reversed our judgment, and remanded the case back to us to address the remaining issues. *Basic Capital Management, Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901, 903 (Tex. 2011) (*Basic II*). Those issues hinge upon whether there was legally sufficient evidence to support the jury's findings. With one exception, we conclude that there was. We reverse the trial court's judgment and remand the cause for determination of interest and entry of judgment for appellants pursuant to the jury's findings and this opinion.

The facts of the case are set out at length in our previous opinion (*Basic I*) and in the supreme court's opinion (*Basic II*). As explained in *Basic II*, Dynex Commercial made the New Orleans Loans to three single-asset, bankruptcy-remote entities (SABREs) owned by TCI/CMET: appellants Continental Poydras Corp., Continental Common, Inc., and Continental Baronne, Inc. *See Basic II*, 348 S.W.3d at 896–97 and n.5. There was evidence that the New Orleans Loans transactions were conditioned on the execution of the Commitment between Dynex Commercial and Basic, a company that managed publicly-traded real estate investment trusts in which it also owned stock (including

---

[1] TCI merged with Continental Mortgage & Equity Trust (CMET) in November 1999, after this suit was filed. TCI was the surviving entity. The parties refer to this entity as TCI/CMET, as do we.

ART and TCI/CMET). *Id.* at 897. Under the Commitment, $160 million in loans were also to be made to other SABREs to be owned by ART or TCI/CMET. *Id.*

ISSUES

Appellants present eight issues. Generally, these issues assert the trial court erred in granting the motion for judgment notwithstanding the verdict, failing to enter judgment on the jury's verdict, disregarding the jury's findings, entering judgment for appellees, and failing to award attorney's fees, interest, and costs to appellants. In the alternative, appellants contend that the trial court should have granted a new trial rather than entering a take-nothing judgment.

In addition, appellees filed cross-points challenging the legal sufficiency of the evidence to support each of the jury's findings in favor of appellants. *See* TEX. R. APP. P. 38.2(b) (where trial court renders judgment notwithstanding the verdict on one or more questions, appellee "must bring forward by cross-point any issue or point that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict"). Appellees also contend there is legally insufficient evidence of the material element that Basic tendered performance under the Commitment, and they specifically challenge the jury's failure to find release of the Commitment. Appellees assert that appellants are not entitled to a new trial.

We note that much of the parties' briefing was directed to the issues decided by the supreme court. Because the supreme court determined that ART and TCI/CMET were "entitled to recover for Dynex's breach of the Commitment and the New Orleans Agreement . . ." [i.e. the New Orleans Loans], *see Basic II*, 348 S.W.3d at 901, we do not include any further discussion of standing, capacity, privity, agency, or any other issues relating to any defect of parties in the pleading, proof,

–3–

or requested jury findings. *See id.* at 898–901.[2] Neither do we consider further the parties' argument and briefing on whether consequential damages for breach of the Commitment were foreseeable, because the supreme court decided this question in the affirmative. *See id.* at 901–03.

## STANDARD OF REVIEW

A judgment notwithstanding the verdict is proper when (1) the evidence is conclusive and one party is entitled to judgment as a matter of law or (2) a legal principle precludes recovery. *Sheehan v. Adams*, 320 S.W.3d 890, 895 (Tex. App.—Dallas 2010, no pet.) (citing *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003)); *see* TEX. R. CIV. P. 301. We review challenges to a trial court's ruling on a motion for judgment notwithstanding the verdict under the same legal sufficiency test applied to appellate no-evidence challenges. *City of Keller v. Wilson*, 168 S.W.3d 802, 822–23, 827 (Tex. 2005). The test for legal sufficiency "must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. We view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 807.

In that context, the jury is the sole arbiter of disputed testimony, the credibility of the witnesses, and of the weight to give their testimony. *See id.* at 819. They may choose to believe one witness and disbelieve another. *Id.* A reviewing court may not impose its own opinion to the

---

[2] The supreme court stated, "[r]egardless of whether the issue is properly denominated standing, as the parties seemed to think in the trial court, or capacity, as petitioners have argued on appeal, the *substance* of Dynex's assertion . . . [is] that ART and TCI cannot recover for Dynex's breaches of its agreements because they were not parties to the agreements . . . ." *Basic II*, 348 S.W.3d at 899. Appellees also argue that appellants did not plead, prove, and/or obtain jury findings on each essential element of recovery for each individual plaintiff entity. We consider these arguments to have been addressed and resolved by the supreme court as well. *See, e.g., id.* at 901 (rejecting appellees' argument that ART's and TCI/CMET's failure to request a jury finding on whether they were third-party beneficiaries was fatal to their recovery).

contrary. *Id.* In reviewing the verdict, we must assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it. *Id.*

We note that during the trial, some two dozen fact witnesses testified before the jury over the course of more than four weeks. Almost every fact relating to the appellants' claims and Dynex's defenses was hotly contested.[3] The parties disagreed not only as to whether contracts were formed and breached, but also even disputed whether one of the persons involved in the transactions, who was deceased by the time of trial, was actually working on behalf of Dynex or the appellants.

DISCUSSION

A.    Claim for Breach of the Commitment

In their first issue, appellants contend the trial court erred in failing to enter judgment in favor of Basic, ART, and TCI/CMET on the claim for breach of the Commitment. Appellants also argue in their first and third issues that the jury's findings regarding the Commitment were supported by legally sufficient evidence. These findings were: that Basic and Dynex entered into an agreement regarding the Commitment (Question 1); that Dynex failed to comply with the terms of the Commitment (Question 2); that Dynex's failure to comply was not excused (Question 3); and that there was no agreement to release the Commitment (Question 4). The jury awarded damages to Basic, ART, and TCI/CMET in response to Question 6. Under Question 6, the jury found Basic suffered no damages for "increased costs," but suffered $256,233.25 for "lost opportunity." The jury found damages to ART of $1,222,640.27 in increased costs and $14,205,570 for lost opportunity,

_____

[3]We generally refer to all of the plaintiff entities as "appellants," and to appellees as "Dynex."

and damages to TCI of $960,646.28 in increased costs and $11,161,520 for lost opportunity. We review the evidence supporting the jury's findings.

1.      Contract and Breach

The jury found (in response to Questions 1 and 2) that the Commitment existed and that it was breached by Dynex. Witnesses testified Dynex required appellants' commitment to borrow $160 million over a period of 18 months in exchange for financing $37 million to acquire and rehabilitate three commercial buildings in New Orleans (referred to at trial as the 1010 Commons, Amoco, and Baronne buildings). There was evidence that a written agreement was signed on behalf of both parties. There was evidence that the parties agreed on the type of entities that could borrow under the agreement, the types of properties that could be submitted, the loan amounts, the amortization periods, the interest rate, the term of the Commitment, and other material terms. There was evidence that the agreement was approved by TCI/CMET's board of directors. There was evidence that a $2 million second mortgage on the New Orleans properties, required by Dynex to secure the Commitment, was recorded. There was evidence that Dynex loaned the money to purchase the New Orleans buildings, but did not loan any tenant improvement monies under the contract. There was evidence that Basic submitted approximately $5 million in loans to Dynex under the Commitment, and that Dynex then refused to loan any more money under the Commitment.

As noted above, there was conflicting evidence on almost all of these issues. Dynex disputed that it intended the series of letters signed by the parties to constitute a contract, and it contended essential terms were missing from the agreement. Dynex argued that only the New Orleans portion of the transaction was approved by TCI/CMET's board of directors, not the Commitment. Dynex

–6–

also offered evidence that the tenant improvements in the New Orleans buildings were not funded because the plaintiffs never provided the required documentation. There was evidence that appellants did not submit deals to be funded under the Commitment when they promised to do so and could have done so.

But the jury was the sole judge of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. The jury resolved these conflicts in the appellants' favor. There was sufficient evidence to support the jury's answers to Questions 1 and 2. *See id.* at 827.

### 2. Excuse of Performance

The jury found (in response to Question 3) that Dynex's failure to comply with the terms of the Commitment was not excused. The jury was instructed that "[f]ailure to comply by one party is excused by the other party's previous failure to comply with a material obligation of the same agreement." Dynex asserts a cross-point contending that Basic did not tender performance under the Commitment, but rather breached the contract first by not submitting applications for loans under the Commitment. Citing *Barnett v. Coppell North Texas Court, Ltd.*, 123 S.W.3d 804, 815 (Tex. App.—Dallas 2003, pet. denied), Dynex argues that Basic failed to produce evidence of its performance, an essential element of its claim for breach of contract.

There is evidence appellants borrowed approximately $5 million under the Commitment for a transaction involving three apartment complexes in Midland and Odessa, Texas. There was also evidence that Dynex refused to consider further loans under the Commitment after this $5 million loan was made. One witness testified that a principal of Dynex stated that it would be "a cold day

–7–

in hell" before the Commitment was funded. There was evidence that the parties agreed that appellants would have at least 18 months to fulfill the Commitment, and approximately half of this period remained at the time Dynex refused to make further loans. This was some evidence from which reasonable jurors could conclude that appellants tendered performance and did not breach the Commitment first.

### 3. Release

In the alternative, Dynex argues by cross-point that, despite a jury finding to the contrary (in Question 4), it established as a matter of law that the parties entered into a legally binding release of the Commitment. To establish the release as a matter of law Dynex relies on two letters, both dated January 7, 1999. Dynex argues that Basic drafted the pertinent portion of the letters that allegedly constitute the release under which Basic would release the Commitment simultaneously with Dynex's completion of three other transactions. Dynex Commercial's president testified that Dynex completed the three transactions, and no further documentation was necessary to effectuate the release. Dynex argues that a release is not ineffective simply because the parties contemplate later formal documentation, citing *Padilla v. LaFrance*, 907 S.W.2d 454, 460–61 (Tex. 1995). Dynex also argues Basic retained the benefits of the completed transactions and is estopped from challenging the effectiveness of the release, citing *Newman v. Link*, 889 S.W.2d 288, 289 (Tex. 1994).

Before trial, both parties moved for summary judgment on the issue of release. The trial court denied both motions, finding that an issue of fact existed to be resolved by the jury. *See Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 554–56 (Tex. 1972) (whether parties intended to make

–8–

contractual agreement is usually fact issue for jury). At trial, both parties offered evidence regarding the purported release. Appellants contended that three conditions in the release did not obligate Dynex to do anything it was not already obligated to do. *See, e.g., Pasadena Police Officers Ass'n v. City of Pasadena*, 497 S.W.2d 388, 392–93 (Tex. Civ. App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.) (when party agrees to do no more than he is already bound to do under existing contract, consideration insufficient to support supplemental contract or modification). The jury heard hours of testimony from numerous witnesses regarding whether the three conditions set out in the letters were already obligations of Dynex. The jury also heard evidence that, unlike the Commitment, the release was not approved by the board of directors or board of trustees of any of the appellant entities, and that this approval was required. And there was evidence the parties intended that additional documents be drafted to effectuate the release of the Commitment.[4] The January 7, 1999 letter drafted by Dynex stated that upon Dynex's receipt of a signed copy of the letter, "we will proceed to the drafting of the necessary legal documents to modify or amend the existing commitments." There was evidence that a draft release was prepared by Dynex's lawyer, but never executed. There was evidence that this draft release was to be effective as of February 26, 1999, not as of January 7, 1999, the date of the letters on which Dynex relies. From this evidence, the jury could have concluded that there was no agreement to release the Commitment. *See Scott*, 489

---

[4] In support of their argument that the January 7, 1999 letters were a binding agreement to release the Commitment, Dynex cites several cases in which settlement agreements were enforced under Rule 11, Texas Rules of Civil Procedure, where the parties had entered into written agreements to settle pending lawsuits, but further documentation was to be drafted. *See, e.g., Hardman v. Dault*, 2 S.W.3d 378, 380 (Tex. App.—San Antonio 1999, no pet.) (settlement memorandum could be enforced where intent to be bound was clear and unambiguous, even though final documents were to be drafted to carry out the agreement). These cases recognize, however, that it is a question of fact whether the parties intended the settlement agreements to be binding. *See id.* (intent of parties to be bound is often a question of fact).

S.W.2d at 554–56. As a result, Dynex did not prove as a matter of law that the Commitment had been released.

4.    Damages

As noted above, the jury awarded damages to appellants for both "increased costs" (direct damages) and "lost opportunity" (consequential damages or lost profits) for Dynex's breach of the Commitment. Appellants offered the testimony of Ray Perryman, an economist, in support of both measures.

a.    Direct damages

For direct damages, Perryman developed an increased cost model to calculate the difference between the interest rate that would have been charged by Dynex for loans under the Commitment and the market interest rates that appellants were actually required to pay. Perryman's model assumed that no loans would have been financed through Dynex until after September 1, 1998, when the Dynex-contracted interest rate became favorable for appellants. Because there was conflicting evidence whether the Commitment was to last 18 or 24 months, Perryman calculated a result for both time periods. Perryman compiled a list of properties actually acquired by appellants during the relevant time periods. He conducted a review of the loan files on these properties, and analyzed each loan. He explained his methodology to the jury, and his report and supporting documents were admitted into evidence.

Under the increased cost model, Perryman concluded that appellants paid approximately $4.2 million to $5.2 million more in interest than they would have paid under the Commitment. The jury awarded appellants a total of $2,183,287 in increased costs. This amount was within the range

–10–

supported by Perryman's calculations; it is Perryman's 18-month figure minus his calculation for one property, the Cliffs of El Dorado Apartments. For this property, the parties had offered conflicting testimony regarding whether a loan would have been funded under the Commitment.

Dynex concedes that the measure of direct damages for breach of an agreement to lend is the difference between the contractual rate of interest and the rate of interest the borrower obtained from another source. *See Investors, Inc., v. Hadley*, 738 S.W.2d 737, 739 (Tex. App.—Austin 1987, writ denied). They contend, however, that the evidence is insufficient to support the jury's damage award for increased costs because appellants' witnesses testified that they actually borrowed money from other lenders at a lower cost than the interest rate offered by Dynex under the Commitment. The record shows, however, that the lower costs were incurred before September 1998 when the market rates changed. The evidence showed that after September 1998, the rate under the Commitment was below the market rate. Dynex's own witnesses conceded that in the fall of 1998, the rate under the Commitment was no longer favorable to Dynex; Dynex's president William Moore testified that he told appellants "there was no way that we would and/or could close the loans at that spread." There is no evidence that after September 1998 there were funds available in the market at a rate lower than the Commitment rate.

Dynex also contends that thirty percent of the properties included in Perryman's interest cost model were owned by corporations that were not parties to the lawsuit. There was evidence, however, that these entities were also managed by Basic. There was also evidence that the parties contemplated that any of the five public companies managed by Basic could borrow money under the Commitment and have the amount of the loan credited toward the $160 million total.

The jury's award of direct damages was within a range supported by the evidence. *See Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied) (jury has discretion to award damages within range of evidence presented at trial as long as rational basis exists for jury's calculation). We conclude judgment notwithstanding the verdict was not proper on this issue.

> b.    Consequential damages

In the appeal of our previous judgment, the supreme court discussed recovery of consequential damages for breach of a contract to lend money. *See Basic II*, 348 S.W.3d at 901–03. The court stated, "[t]o be liable for the consequential damages resulting from a breach of a loan commitment, the lender must have known, at the time the commitment was made, the nature of the borrower's intended use of the loan proceeds but not the details of the intended venture." *Id.* at 903. The supreme court concluded, "[i]n sum, the evidence establishes that Dynex clearly knew how the Commitment would be used. Indeed, it would be surprising if Dynex had agreed to lend Basic $160 million without such knowledge." *Id.* Having concluded that appellants' damages were foreseeable, the court remanded the case for our consideration whether there was sufficient evidence to support the jury's award of damages. *Id.* at 903–04.

Perryman calculated appellants' alleged lost profits under his "lost opportunity" model. Although the "lost opportunity" title suggests that appellants were completely unable to secure

–12–

funding for potential deals, and the supreme court may have interpreted it as such,[5] Perryman's explanation was somewhat different. According to Perryman, the "opportunity" that was "lost" was the opportunity to invest the $155 million remaining in the Commitment, borrowed at the attractive rate offered by Dynex. Perryman did not assume that plaintiffs would not close deals at all, but rather that they lost the profits that would have resulted from the investment of an additional $155 million in the regular course of their business. Appellants argue they "suffered a lost volume of investment capital when Dynex repudiated the $160 Million Commitment," rather than a loss of specific deals that were priced out of reach.

Perryman's model attempted to determine economic losses "equal to the estimated lost return earned on the funding that was to be made available by Dynex," according to Perryman's report. He determined the lost return rate by "taking the differential between the estimated total return and the estimated cost of funds." Perryman gathered information for his model from a variety of sources, including financial information, annual reports, SEC filings, real estate reports, real estate loan documents, and other information he obtained from Basic and its affiliates. He also relied on relevant industry and market information, including publicly-available information regarding real estate investment trusts (REITs). After determining rates of return for TCI/CMET and ART over

---

[5] In its ruling that consequential damages for a lender's breach of a commitment to provide financing for future investments are foreseeable, the court stated,

> Dynex certainly knew that if market conditions changed and interest rates rose, its refusal to honor the Commitment would leave Basic having to arrange less favorable financing. Because that is in fact what happened, Dynex argues that it had no reason to expect that Basic's increased financing costs would price some investments beyond reach, resulting in opportunities lost altogether. But we cannot infer from Basic's ability to arrange for alternate financing in a few instances that it could always do so, and nothing in the record supports such a counterintuitive proposition. Certain that its breach would increase Basic's costs, Dynex cannot profess blindness to the foreseeability that its breach would also cost Basic business. Which is not to say that it actually did.

*Basic II*, 348 S.W.3d at 903.

a ten-year period, and comparing those rates to the "historical long-term return for publicly-traded equity REITs," Perryman used the lowest of these rates, 12 percent, for the rate of return in his damages model. He then determined the cost of funds to be 7.1 percent per year, based on published historical and projected interest rates. Perryman subtracted the cost of funds from the rate of return to determine an average net rate of return of 4.9 percent, which he applied to the $155 million remaining in the Commitment. He projected losses over a ten-year period, and discounted the future dollars to present value using a 12 percent discount rate. After subtracting additional percentages for fees and expenses, Perryman testified that the total lost opportunity damages were $36,545,012.

Dynex argues that Perryman's opinion testimony was based on inaccurate assumptions and incorrect data, and therefore was no evidence of damages. Specifically, Dynex argues that Perryman assumed, in conflict with the evidence, that appellants were not able to purchase properties because the Commitment was unavailable, and that appellants held properties for ten years.

As appellants point out, Perryman's assumptions were consistent with the evidence presented at trial. The evidence showed that Dynex's refusal to fund deals under the Commitment resulted from the rise in market interest rates in the fall of 1998 that made the terms unfavorable to Dynex. *See Basic II*, 348 S.W.3d at 897. Mark Nardizzi, a commercial real estate broker who identified real estate assets for Basic to recommend to the trusts for purchase, testified that he became aware of the availability of below market rate financing from Dynex in that time period. *See Basic I*, 254 S.W.3d at 521. He testified that he could look for "assets that were a little bit more pricey based on the fact that we could – we would have a lower debt service with Dynex." He explained that he looked for properties and had "three or four" that were "schooled up and ready to go and also a large portfolio

-14-

that I was looking at also." He explained that these properties may have been "out of reach before, but now we could afford based on the financing." He testified that the size of the large portfolio was $257 million. He testified that he then learned that the Dynex financing would not be available, and no deals closed under it. He testified that he still continued to look for "property acquisition opportunities" and that there were properties available. Perryman also explained that when interest rates rose, the market for credit tightened, so that fewer potential buyers could obtain financing. Those who had a financing source would receive more offers. Perryman testified that appellants could have done "many times" the $160 million in deals; he stated that "it's not like a close call" that appellants would have received more offers from potential sellers during that time.

As to the assumption that properties would be held for ten years, Dynex contends that in general, companies affiliated with Basic would sell or refinance properties every two to four years. Perryman testified that he used a ten year period for several reasons. First, he determined from his review that Basic's affiliates held multifamily properties on an average of seven to twelve years. Second, the Commitment had a mandatory 9½-year "lockout" term (meaning that the loan could not be paid off in full without penalty until the term had elapsed, to ensure that the lender would receive a particular rate of return). Appellants also explain that Perryman's model calculated the present value of each future year's lost profits, not the lost profits for ten years in aggregate. And appellants point out that the jury awarded approximately five years of lost profits rather than the full amount to which Perryman testified.

In *Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992), the court explained that "[r]ecovery for lost profits does not require that the loss be susceptible of exact

-15-

calculation." But the amount of the loss "must be shown by competent evidence with reasonable certainty." *Id.* The *Holt Atherton* court explained, "[w]hat constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Id.* The court stated, "[a]s a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.* Where there is an established business, pre-existing profits may be used to evidence the amount of loss with reasonable certainty. *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 261 (Tex. 1983).

Here, Perryman's model was based in part on appellants' own actual experience doing business over the course of the relevant time period, and part on the actual experience of similar companies in the industry. Perryman's assumption was that appellants, in the business of making real estate investments, would use the additional $155 million in the same way that it used other sources of funds. As he explained the lost opportunity model to the jury:

> [I]f you ask yourself if I would have had access to this money and I run a company that knows how to buy these properties and finance these properties and manage these properties and gain income of these properties and sell these properties what would I do with that money, assuming I had the management I needed, personnel I needed, equipment I needed, all of this that I had. Assume I had all of these projects every year, which I do, what would I have done with that money? You would have taken it out and done what you do with all of the other money that you have access to. That's a much more common sense type of approach. If you try to ask yourself what would I have done with that money if I received it, if you are in that business, that's what you do with that money.

Dynex also complains that Perryman did not allocate the damages allegedly suffered by Basic, ART, or TCI/CMET, to any individual company, but instead calculated a single amount of profit lost to all of the appellant entities. They argue that the separate awards by the jury to specific

–16–

appellants cannot be the basis for judgment when Perryman's testimony did not make any allocation. We disagree. As we have noted, the amounts awarded by the jury are within the range of the evidence presented at trial. Perryman valued "the entire lost opportunity to all the entities," and the jury awarded a portion of this amount. In addition, appellants offered the testimony of Robert Waldman, a former general counsel and officer of Basic, regarding the allocation of Perryman's damages calculations among Basic, ART, and TCI/CMET, and the jury followed that allocation in the verdict. Judgment on the jury's allocation would have been proper. *See Ortiz v. Avante Villa at Corpus Christi, Inc.*, 926 S.W.2d 608, 612 (Tex. App.—Corpus Christi 1996, writ denied) (question of apportionment of damages among plaintiffs was not of concern to defendant and did not interfere with enforceability of judgment).

The jury awarded some, but not all, of the damages for which appellants offered evidence. We conclude that there was sufficient evidence to support the jury's awards, and judgment notwithstanding the verdict was not proper. *See Sheehan*, 320 S.W.3d at 895.

5.    Conclusion

As noted by Dynex, the elements of a breach of contract claim are: (i) the existence of a valid contract between the plaintiff and defendant; (ii) the plaintiff's performance; (iii) the defendant's breach of the contract; and (iv) the existence of damages to the plaintiff as a result of the breach. *See Barnett*, 123 S.W.3d at 815. The jury made findings in favor of appellants on each of these elements, and the findings were supported by legally sufficient evidence. We sustain appellants' first and third issues.

B.    Claim for Breach of the New Orleans Loans

In their second issue, appellants contend the trial court erred in failing to enter judgment in favor of TCI/CMET on the claim for breach of the New Orleans Loans. In their second and fourth issues, appellants argue that the jury's findings regarding the New Orleans Loans were supported by legally sufficient evidence. These findings were that the parties entered into an agreement regarding the New Orleans Loans (Question 10); that Dynex failed to comply with the terms of the New Orleans Loans (Question 11); and that TCI/CMET suffered $252,577 in damages for lost opportunities (Question 12).

The New Orleans Loans were evidenced by the same set of letters that formed the Commitment, as well as by formal loan documents admitted into evidence at trial. The evidence showed that the New Orleans Loans were funded, resulting in the purchase of the buildings. The point in dispute was whether Dynex was required to reimburse appellants for money spent on tenant improvements. The loan documents provided for initial advances for purchase of the buildings, and "future advances" to fund tenant improvements. The future advances would be made if the borrowers satisfied certain requirements. Both parties offered testimony and exhibits regarding the sufficiency of the documentation submitted to Dynex to support appellants' request for the additional advances. There was also conflicting evidence as to whether the amount of rent appellants could charge to tenants in the buildings was affected by Dynex's failure to lend the amounts spent for the tenant improvements.[6] There was no dispute that Dynex never reimbursed appellants for the expenses, or that TCI/CMET paid for the tenant improvements at issue. The jury resolved the conflicts, and there was evidence to support the jury's answers to both Questions 10 and 11.

---

[6] The jury apparently rejected this testimony, because they awarded zero damages for lost rent in any of the three New Orleans buildings. Appellants do not complain of these findings on appeal.

Regarding Question 12, Perryman's testimony sought to provide evidence supporting the jury's award of damages. In a calculation similar to the one undertaken for "lost opportunity" under the Commitment, Perryman determined the amount of money appellants were required to spend on tenant improvements in New Orleans and were thus unable to invest or use elsewhere. His report indicates that for the basis of his calculation, he used amounts spent in tenant improvements (described as "loan amount affected") of $675,425 for the 1010 Common building, $637,773 for the Amoco building, and $279,889 for the Baronne building, for a total of $1,593,087. He then calculated the net profit appellants could have realized from the investment of these funds, arriving at the amount of $252,577, which was the amount awarded by the jury in response to Question 12.

The supreme court's opinion did not address recovery of damages for breach of the New Orleans Loans; its discussion of damages for lost profits related to the Commitment. *See Basic II*, 348 S.W.3d at 903. The court stated: "To be liable for the consequential damages resulting from a breach of a loan commitment, the lender must have known, at the time the commitment was made, the nature of the borrower's intended use of the loan proceeds but not the details of the intended venture." *Id.* at 903. The intended use of the loan proceeds from the New Orleans Loans was twofold. First, the proceeds were to be used to purchase the three office buildings. Second, Dynex was to reimburse appellants for improvements made to the buildings. In contrast to the Commitment, under which appellants were unable to carry out any "intended ventures" on which they expected to profit, both of the "intended ventures" of the New Orleans Loans were accomplished. The buildings were purchased with funds borrowed from Dynex and the improvements were made with appellants' own funds. It is undisputed that Dynex did not reimburse

appellants for any tenant improvements. But instead of requesting jury findings to recover the amount spent on tenant improvements, appellants sought only lost profits and lost rents as damages from Dynex's breach of the New Orleans Loans. The record reflects that appellants' proposed jury charge included an instruction to consider only lost opportunities in determining damages for breach of the New Orleans Loans, and that Dynex objected to this measure of damages in the charge conference.

Under the Commitment, the purpose of the loan was to provide investment capital for large real estate transactions. The purpose of the New Orleans Loans was different. The parties intended that the proceeds from the New Orleans Loans would be used for the acquisition and rehabilitation of three identified commercial buildings. In fact, the evidence established that the Commitment was negotiated precisely because the acquisition and rehabilitation of the New Orleans buildings was not Dynex's core business. *See Basic I*, 254 S.W.3d at 511 and n.3 (as part of "intertwined" deal to finance purchase of New Orleans buildings, two-thirds of loan proposals under the Commitment would be for purchase of multi-family residential properties, which made up Dynex's core business). Any profit to appellants from the New Orleans Loans would come from the leasing and operation (or perhaps eventual sale) of the three buildings, not from the prospective investments that were the basis for Perryman's lost profit calculations. In their response to Question 12, however, the jury rejected appellants' claim for "lost rents" arising from Dynex's failure to fund the New Orleans Loans, defined in the jury charge as "loss in value from rents and rental opportunities." We conclude that appellants failed to establish that they sustained lost profits as a result of Dynex's breach of the New Orleans Loans. *See Basic II*, 348 S.W.3d at 903 (question whether appellants actually sustained

-20-

lost profits is different from question whether lost profits were foreseeable). Although the evidence supported the jury's findings in response to Questions 10 and 11, the trial court's judgment notwithstanding the verdict was proper as to Question 12. We overrule appellants' second and fourth issues.

C.     Take-nothing Judgment

In their fifth issue, appellants contend that the trial court erred by granting Dynex's "Motion to Enter Take-Nothing Judgment With Respect to Plaintiffs' Claims." In our discussion of appellants' first four issues, we have concluded that judgment notwithstanding the verdict was not proper on appellants' claim for breach of the Commitment. Therefore, the trial court should not have granted Dynex's motion to enter a take-nothing judgment. *See* TEX. R. CIV. P. 301 (trial court may render judgment non obstante veredicto only if directed verdict would have been proper). We sustain appellants' fifth issue.

D.     Attorneys' Fees

The jury found $1,950,000 was a "reasonable fee for the necessary services of Plaintiffs' attorneys in this case" through trial. (The jury also made findings as to the reasonable amount of appellate attorneys fees.) In their sixth issue, appellants contend there was legally sufficient evidence to support the jury's findings on attorneys' fees, and thus that the trial court erred in entering judgment notwithstanding the verdict on their request for attorneys' fees. Within that issue they begin their argument by stating "Because [appellants] prevailed at trial against Dynex on two breach of contract claims, they were entitled to recover attorneys' fees. *See* TEX. CIV. PRAC. & REM. CODE § 38.001(8)."

Appellants presented evidence at trial regarding their reasonable and necessary attorney's fees incurred in prosecuting their breach of contract claims. And we have concluded the trial court erred in not awarding appellants damages for breach of the Commitment based on the jury's verdict. However, we have also concluded that the trial court did not err in entering judgment notwithstanding the verdict on appellants' breach of contract claim based on the New Orleans Loans.

There is an interplay between the amount of damages and the amount of attorney's fees found by a jury: "[U]nless an appellate court is 'reasonably certain that the jury was not significantly influenced by the erroneous amount of damages it considered,' the issue of attorney's fees should be retried if the damages awarded are reduced on appeal." *Young v. Qualls*, 223 S.W.3d 312, 314–15 (Tex. 2007) (per curiam); *see Solar Soccer Club v. Prince of Peace Lutheran Church of Carrollton*, 234 S.W.3d 814, 829 (Tex. App.—Dallas 2007, pet. denied). Indeed, one of the factors the jury was instructed to consider in determining attorneys' fees in this case was "the amount involved and the results obtained."

The jury's award of damages for breach of the New Orleans Loans was significantly less than the damages for breach of the Commitment. And as described above and in *Basic I* and *Basic II*, the two claims were related to some degree. However, the attorneys fees necessary to pursue the two claims are not identical. We may not parse through the evidence in a retrospective attempt to determine how much of the appellants' attorneys' fees related solely to the claim for breach of the New Orleans Loans, *see Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006). Neither do we undertake to guess whether and to what extent the jury's award of attorneys' fees

would have been impacted if it had been instructed to consider only the "amounts involved and results obtained" with respect to the claim for breach of the Commitment.

Appellants sought to hold Dynex liable for two different breaches of contract. We agree they properly prevailed on one of those claims—breach of the Commitment. However, we cannot be reasonably certain the jury was not influenced by the amount of damages erroneously found with respect to the breach of the New Orleans Loans. *See Young*, 223 S.W.3d at 315. As a result, the issue of appellants' attorneys fees should be retried. *See Solar Soccer Club*, 234 S.W.3d at 829. We sustain appellants' sixth issue only to the extent of remanding the determination of the amount of reasonable and necessary attorney's fees for a new trial. We reverse the portion of the judgment denying appellants their reasonable attorneys' fees related to their claim for breach of the Commitment and remand that issue to the trial court for further proceedings.

E.     Interest and Costs

In their seventh issue, appellants contend they are entitled to recover pre- and post-judgment interest as well as their costs. Because we have determined that judgment on the jury's verdict would have been proper, appellants as the prevailing party may recover interest and costs. TEX. R. CIV. P. 131; *Hasty, Inc. v. Inwood Buckhorn Joint Venture*, 908 S.W.2d 494, 502–03 (Tex. App.—Dallas 1995, writ denied) (successful party to suit shall recover all costs from his adversary unless trial court states otherwise); *Dallas Cnty. v. Crestview Corners Car Wash*, 370 S.W.3d 25, 50–51 (Tex. App.—Dallas 2012, pet. denied) (prejudgment interest calculated up to date of judgment and included as part of final judgment; postjudgment interest begins to accrue on entire amount from date of judgment until paid; remanded for trial court to recalculate prejudgment interest). We sustain

appellants' seventh issue; however, in light of the change in the amount of damages awarded, the trial court must recalculate the amount of prejudgment interest.

F.      Rendition or Remand

In their eighth issue, appellants contend the trial court erred by granting a take-nothing judgment instead of ordering a new trial. We need not address this issue in light of our disposition of the previous issues. We are to render the judgment the trial court should have rendered, unless a remand is necessary for further proceedings. See TEX. R. APP. P. 43.2, 43.3. Judgment for appellants is appropriate on the jury's verdict for liability and damages relating to the Commitment. We remand only for a new trial on the amount of attorney's fees and for the trial court to determine the correct amounts of prejudgment and postjudgment interest due appellants. *See Dallas Cnty.*, 370 S.W.3d at 51.

## CONCLUSION

We conclude that the evidence was legally sufficient to support the jury's verdict. We sustain appellants' issues one, three, five, six, and seven. We reverse the trial court's judgment and remand the cause for entry of judgment on the jury's verdict for damages for breach of the Commitment, for a new trial as to attorneys' fees, and for costs, prejudgment and postjudgment interest in an amount to be determined by the trial court.

JIM MOSELEY
JUSTICE

041358rf.p05

-24-



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BASIC CAPITAL MANAGEMENT, INC.,
AMERICAN REALTY TRUST, INC.,
TRANSCONTINENTAL REALTY
INVESTORS, INC., CONTINENTAL
POYDRAS CORP., CONTINENTAL
COMMON, INC., and CONTINENTAL
BARONNE, INC., Appellants

No. 05-04-01358-CV      V.

DYNEX COMMERCIAL, INC. and
DYNEX CAPITAL, INC., Appellees

Appeal from the 68th Judicial District Court
of Dallas County, Texas. (Tr. Ct. No. 03-
00675).
Opinion delivered by Justice Moseley,
Chief Justice Wright and Justice Lang,
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED IN PART AND REVERSED IN PART.** We affirm the portion of the trial court's judgment granting judgment notwithstanding the jury's verdict regarding the New Orleans loans. We **REVERSE** the remainder of trial court's judgment and **REMAND** the cause to the trial court for entry of judgment on the jury's verdict for damages for breach of the $160 million commitment, for new trial as to attorney's fees, and for costs and prejudgment and postjudgment interest in an amount to be determined by the trial court. It is **ORDERED** that appellants Basic Capital Management, Inc., American Realty Trust, Inc., Transcontinental Realty Investors, Inc., Continental Poydras Corp., Continental Common, Inc., and Continental Baronne, Inc., recover their costs of this appeal from Appellees Dynex Commercial, Inc. and Dynex Capital, Inc.

Judgment entered February 13, 2013.

JIM MOSELEY
JUSTICE